Filed 10/14/22  P. v. Wilson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br>v.<br>GREGORY WILSON,<br><br>       Defendant and Appellant. | A157365<br><br>(Solano County<br> Super. Ct. No. VCR-0223009) |

Defendant Gregory Wilson appeals from a jury verdict finding him guilty of felony torture (Pen. Code,[1] § 206) and two counts of felony child abuse (§ 273a, subd. (a)) with respect to then-two-year-old A.Y.  On appeal, Wilson raises numerous claims of error involving:  (1) the repeated denial of his attorney's motions for continuance at the start of trial; (2) the failure to sever his case from that of A.Y.'s mother (mother); (3) the exclusion of certain evidence regarding mother's parenting practices; (4) the admission of evidence regarding  a previous domestic violence incident under Evidence Code section 1109; (5) insufficient investigation of potential juror misconduct; (6) insufficiency of the evidence supporting his torture conviction; (7) failure

_____

[1] All statutory references are to the Penal Code unless otherwise specified.

to instruct on lesser included offenses to torture; and (8) cumulative error. We affirm.

## I.

## BACKGROUND

On January 10, 2018, the Solano County District Attorney filed an amended information charging Wilson with felony torture (§ 206, count 1) and four counts of felony child abuse (§ 273a, subd. (a), counts 2–5), all with respect to A.Y. Each of the four child abuse counts was enhanced by allegations of infliction of great bodily injury on a child younger than five years old. (§ 12022.7, subd. (d).) The information additionally alleged that Wilson had served a prior prison term (§ 667.5, subd. (b)), suffered a prior strike conviction (§§ 667, subd. (b)–(j), 1170.12), and suffered a prior serious felony conviction (§ 667, subd. (a)). Finally, mother was charged in the amended information with one count of child endangerment based on her failure to protect A.Y. from Wilson's abuse. (§ 273a, subd., (a), count 6.) The following evidence was adduced at trial.[2]

### A.  *General Prosecution Evidence*

Firefighter paramedic Anthony Shair-Ali testified that he responded to a residence in Vallejo around 1:30 p.m. on November 21, 2014, where he found Wilson sitting on the couch holding A.Y. in his lap. The child was motionless, nonresponsive, and breathing shallowly. Wilson told Shair-Ali that A.Y. had been acting normally "about two hours" beforehand, but then A.Y. vomited, and he found the child unresponsive. The paramedic was so concerned about A.Y.'s condition that he had the child transported to a local

---

[2] Because mother was ultimately acquitted of child endangerment, and Wilson was acquitted of two of his four child abuse counts, we focus our factual recitation on matters relevant to Wilson's appellate claims.

facility (Kaiser Hospital Vallejo) rather than Children's Hospital in Oakland.[3] During transit, Shair-Ali inspected A.Y. and saw small, circular marks on A.Y.'s forearms in various stages of healing that he believed to be burn marks. He also observed "an abrasion or some type of old injury to the right side of [A.Y.]'s head" as well as a "hematoma to the right eye area."

Medical Social Worker Earnestine Moore Harris spoke with Wilson and mother at Kaiser Hospital Vallejo on November 21, 2014. Wilson told the social worker that he was mother's boyfriend and that he took care of A.Y. while mother worked full time. Wilson reported feeding A.Y. and then laying down to take a nap earlier that day. When he woke up, he found A.Y. unresponsive. Mother told Harris that she did not know what had happened to A.Y.

Child welfare social worker Denise Manuel also spoke to Wilson on the day of the incident. Wilson told her that he lived in the home with mother and her children and that he was their primary care provider. He stated it had been "pretty much a regular day," although A.Y. "was a little whinier than normal that morning." He thought A.Y. was getting a fever, as he was sleeping more than usual. When A.Y. woke up, he requested milk to drink and then the two cleaned the house until A.Y.'s half-brother, Anthony, woke up. Wilson fed the children and, at some point that morning, a pest control person came to the residence to spray the kitchen area. The children left the kitchen while it was being treated. Wilson put A.Y. in the bath around 11:30 a.m. and went to help Anthony with some laundry. When he returned to the bathroom, A.Y. stated that his leg hurt, pointing to his groin. Wilson stated he did not see any marks on A.Y.'s hips and suggested the child might have

---

[3] A.Y. was airlifted to Children's Hospital later that evening for treatment, emergency brain surgery, and subsequent rehabilitation.

burned himself on a wall heater. He did report that, as he dried off A.Y., he scrubbed some scabs off A.Y.'s arm "because they had softened in the bathtub." He laid A.Y. on the couch and, when he returned from getting a diaper, he found A.Y. unresponsive. Wilson's sister arrived and called 911.

Wilson's sister had watched the kids in the week preceding the injury. According to mother, the maternal grandmother sometimes watched the boys. Mother told Manuel on November 24, 2014, that she thought A.Y. had a mark on his eye from falling off a couch and that he had slipped on some steps a day or two before his hospitalization. Mother also disclosed that A.Y. had surgery for a twisted testicle several weeks earlier, but she otherwise reported no health issues. A.Y. did have "a lot of energy." Mother related that she worked full time, an eight-to-five or ten-to-seven shift. Wilson had been living in the home for approximately two years and had taken on responsibilities similar to a father.

Officer Jones responded to Kaiser Vallejo on November 21, 2014. She testified that she observed A.Y. unconscious and hooked up to medical equipment. Officer Jones identified a series of photographs that reflected the injuries she saw on A.Y., including bruising and marks on the left side of his forehead, bruising on the right side of his face near his eye, burns on A.Y.'s body which she recognized from prior experience as having been made by a BIC lighter, and scraped and nonspecific burn marks on his right arm. She thought the BIC lighter burns appeared fresh. Mother spoke to Officer Jones in the emergency room and stated that she did not know how A.Y. received his injuries because she was at work. Wilson had been watching A.Y. for the last two months while she worked. Mother described A.Y. as a playful but clumsy child who liked to rough house with other children and often got hurt. According to mother, A.Y. wanted to cuddle more the day before the

4

hospitalization. Wilson told Officer Jones he did not know what happened. "They were playing and then he found [A.Y.] on the couch."

Detective Yates executed a search warrant at mother's residence on November 21, 2014. He located a pillow with what appeared to be blood on it in the living room. He also found two BIC lighters.

Mayra Montano, who had been a social worker with child welfare during relevant timeframes, testified that mother told her in December 2014 that A.Y. had marks on his left arm and black scabs, as well as a scar on his stomach which had been there for a long time. Mother did not notice any burn marks on A.Y., but stated Wilson bathed both children because she worked. Mother further explained that she worked the Saturday morning before A.Y.'s testicular surgery and some nieces had a sleepover in her home. When she returned from work, Wilson asked one of the nieces to put A.Y. in the tub, and the niece reported his testicles were swollen. A.Y. was being wiped down instead of bathed after the surgery. A maternal aunt, the maternal step-grandmother, and Wilson's sister also watched the boys. Mother had noticed A.Y. being more whiny in the days before his November 21 hospitalization.

Detective Kenney interviewed mother at the Vallejo police station on the night of A.Y.'s hospitalization. Mother stated Anthony's biological grandmother had lived with them temporarily, but mother kicked her out at the beginning of November because she "was making a mess of [the] house." Mother otherwise gave an account of the family circumstances surrounding A.Y.'s hospitalization similar to what she had related to social workers and doctors.

Detective Kenney interviewed Wilson that same day. Wilson indicated that he would watch the boys when mother went to work and that he was

5

watching them on the day of A.Y.'s hospitalization. He saw nothing out of the ordinary in A.Y.'s behavior in the week before the hospitalization. Wilson's description of the activities in the household that morning was similar to his previous statements. When Wilson took A.Y. out of the tub, there was no blood, and the child was not complaining about his head. Wilson later returned to A.Y. on the couch and discovered the toddler was laying back with his tongue partially out of his mouth and it appeared that he had vomited and defecated on himself. After unsuccessfully attempting to wake A.Y., Wilson called mother who was able to get Wilson's sister M.J. to respond to the home. M.J. called 911 upon her arrival. Wilson admitted there were BIC lighters in the house, and he was carrying one on his person. When shown a picture of one of A.Y.'s burn marks, Wilson immediately identified it as a "smiley face" burn from a BIC lighter based on past experience. He denied seeing any such burns on A.Y. but did express concern that Anthony's grandmother had bruised Anthony and was somehow responsible for A.Y.'s testicular surgery.

Detective Matt Mustard interviewed Wilson in February 2015 after reading him his *Miranda*[4] rights. Other than the exterminator, Wilson confirmed that the only individuals in the house during the morning of November 21 were himself, A.Y., and Anthony and that he never left the house. A.Y. was "rambunctious," running around playing, and "everything was normal" until Wilson found the child nonresponsive on the couch. Wilson was surprised when he carried A.Y. to the couch that there was a wet patch on the back of his head because Wilson had not washed the child's hair. He speculated A.Y. might have fallen in the tub. He also mentioned that he had a six-year-old nephew named Carlos that had been setting fires, but he had

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

6

not been at the house on November 21. Wilson told Detective Mustard that, if he had done something like this, he would have fled.

**B.     *Expert Testimony***

Dr. Rachel Gilgoff testified for the prosecution as an expert in child abuse and trauma. After receiving a request to evaluate A.Y., she spoke to mother and Wilson. Mother stated that A.Y. had been "a little more whiney [sic] and clingy" in the week prior to his hospitalization on November 21, 2014. She reported that A.Y. had previously fallen into a coffee table, causing a scratch or cut around his eye, which Dr. Gilgoff confirmed was visible on physical exam. Mother also disclosed that A.Y. had fallen down two stairs on November 15, 2014, cried, got up and fell again while outside playing. There was also information that A.Y. had fallen into a heater, possibly hitting his head. According to mother, the minor did not complain of pain during this timeframe, except to say " 'Owe [*sic*]' " the night before his hospitalization when she brushed his hair, which was typical. Both mother and Wilson stated that A.Y. was clumsy and suffered from short falls.

Wilson reported to Dr. Gilgoff that, on November 21, 2014, he put A.Y. in the bath and left to do other chores. When he returned, A.Y. was trying to get out of the bathtub and had "maybe a little bit of a swollen leg" from a previous injury. Wilson put A.Y. on the couch and left to get diaper changing supplies. When he returned, A.Y. appeared to be unconscious. Wilson did not mention anything about A.Y. bleeding from the head.

Dr. Gilgoff examined A.Y. on November 24, 2014. She observed 5 circular marks of denuded skin on A.Y.'s left arm for which it was difficult to identify a cause, given that the top layer of skin was off. There were two similar marks on his left arm. The doctor was concerned these could have been burn injuries. She also saw "some patterned injuries consistent with

7

[BIC] lighter injuries," which she recognized from prior experience. This particular type of branding injury is referred to as a "happy face" or "smiley face." Dr. Gilgoff observed four smiley face burns on A.Y. One was located on his right thigh, two were on his inner and outer left thigh, and an older burn was found on the bottom of his right foot. Dr. Gilgoff testified that the goal of lighters is to make them child proof so that young children cannot turn them on by themselves. In her professional opinion, A.Y. did not burn himself. Nor did she believe a six year old (Anthony's age at the time of the incident) would be able to both handle the lighter and hold down a screaming, squirming child.

It was hard to date burns without knowing how severe they were to begin with, but, other than the older mark on the foot, Dr. Gilgoff agreed that the marks "could have happened the same day or over a course of days, a week prior, but most likely within a few days" of A.Y.'s November 21 hospitalization. The foot burn could have been anywhere from a week to a month prior to November 21. When Dr. Gilgoff visited A.Y. in rehabilitation sometime after January 6, 2015, one of the burns remained, but was just about healed. In her opinion, the burn injuries were consistent with non-accidental trauma.

Dr. Gilgoff also reviewed A.Y.'s current medical records at Children's Hospital and medical records from Kaiser dating back to his birth, including recent CT scans of his head and abdomen, as well as a bone survey. The November 21 CT scan showed swelling and bleeding on both the right and left side of A.Y.'s head, between the scalp and the bone. There was also bleeding underneath the bone all along the left side of his brain. The left side of the brain was so swollen it was pushing into the right side, and surgery was required to remove a portion of his skull to allow for the swelling. The

8

imaging also showed a skull fracture at the back of his head. Dr. Gilgoff posited the existence of at least two different impact sites on A.Y.'s head due to the swelling on both sides of his head and the possibility of a third impact at the site of the fracture. The scalp swelling on both sides suggested blunt impact injuries. The ophthalmologist who examined A.Y. found retinal hemorrhage in both eyes. Tests for bleeding disorders were negative. The retinal hemorrhages, along with the bleeding inside of the skull, suggested rotational forces such as a shaking or whiplash of the head: "[A]t some point the brain starts moving separate from the skull and that starts ripping the blood vessels that go between the brain and the skull." The CT scan of A.Y.'s abdomen on November 23, 2014 showed a spleen laceration.

Dr. Gilgoff opined that A.Y.'s constellation of injuries when taken together—"injuries to both sides of his head, bleeding inside of his head, swelling of his head, the skull fracture, the numerous burn, branding injuries, the spleen laceration, elevated lipase and liver enzymes [that] were not explained by a bleeding disorder, were not explained by any sign of infection, and would not be explained by individual small falls"—were consistent with "physical assault." She also expressed concern that A.Y.'s November 8, 2014 hospitalization for testicular swelling and bruising was an additional incident of nonaccidental trauma. In addition, Dr. Gilgoff testified that the subdural hematoma appeared to have occurred within three days of the November 21 hospitalization. However, there was no report that A.Y. had head pain (which would have been severe) or vomiting prior to the day of his hospitalization, and he was reported to be smiling and playing tag with his brother, playing on an iPad, and playing in the bathtub during the morning of November 21. This suggested to the doctor that "he wasn't yet so injured that he was about to need surgery or die."

Dr. Steven Gabaeff, called by defendant Wilson, testified as an expert in forensic medicine, specifically as it pertains to child injury, child abuse, and mechanism of injury. He opined that the methodology employed in child abuse pediatrics leads to a potential for misdiagnoses due to "circularity of thinking." For example, "on a case like this where there's bleeding in the head, typically that's going to lead, almost reflexively, to a diagnosis of abuse" by a pediatric child abuse specialist.

Dr. Gabaeff believed that the blood on A.Y.'s head CT scan was a "subarachnoid hemorrhage," internal bleeding within the brain tissue, rather than the "subdural hematoma" as diagnosed by Children's Hospital. A subarachnoid hemorrhage can be caused by "an infectious disease, . . . low oxygen, [or] damage[d] or ruptured blood vessels[] as would occur in a stroke." In his opinion, A.Y.'s clingy and whiny behavior in the days preceding his hospitalization were "symptoms of a disease [that was] evolving." He believed that A.Y. had been suffering from viral encephalitis and that the infection caused A.Y.'s seizure. He testified that a parent could easily miss the warning signs before an encephalitis infection became serious.[5]

Dr. Gabaeff further testified that he did not believe that A.Y. had suffered either a skull fracture or a splenic injury. Moreover, he opined that, if A.Y. had suffered a skull fracture, it could have resulted from a "ground

---

[5] Dr. Gilgoff countered that a diagnosis of viral encephalitis would not account for the bruising or swelling on the outside of A.Y.'s head, the branding, or the skull fracture and that it generally doesn't come with bleeding. She testified that none of the many doctors involved in A.Y.'s care saw any sign of infectious disease. During cross-examination, Dr. Gabaeff acknowledged that he had testified about 10 times per year over the preceding five years that the signs of suspected child abuse had actually resulted from viral encephalitis.

level" fall. Dr. Gabaeff agreed that the three burn marks on A.Y.'s thighs matched a BIC lighter, stating that they were a week to two weeks old. He also believed that the older marks on A.Y.'s arms were burns. He assumed that lighter play by children was the cause of A.Y.'s burn marks.

## C.    *Wilson's Other Defense Evidence*

Wilson's sister T.W. testified that A.Y. was a "happy, very energetic kid" before his hospitalization and she had seen him fall numerous times. It would not have been "unusual for him to have some bruising" on his body. When T.W. went to the hospital on November 8, 2014, due to A.Y.'s swollen testicles, mother told T.W. she was reluctant to bring A.Y. in for care "because he did have some bruises on his body and [mother] did not want the . . . hospital[] to think that she was doing anything with her child." T.W. would see A.Y. almost every day. In the week before A.Y.'s November 21 hospitalization, A.Y. was "whiney [*sic*]" and "clingy" and she saw him trip over a pillow and hit his "right side upper forehead" on a heater grate at her sister M.J.'s house. She did not consider it a "great alarming event."

Another of Wilson's older sisters, M.J., also testified, stating that mother had called her for advice regarding A.Y.'s swollen testicles. M.J. recommended mother take A.Y. to the hospital, but mother was reluctant to do so because of the "scars and . . . recent bumps and bruises that he had on his body." At the hospital, the doctors told them that A.Y.'s testicles were twisted, and they needed to do surgery. M.J. confirmed that A.Y. fell at her house in the week before his November 21 hospitalization. She thought the fall was routine and stated that T.W. (Wilson's sister) was not present. In that same week, M.J. saw A.Y. at least every other day and sometimes saw him running around in just a diaper. She did not see anything other than the usual bumps and bruises on A.Y. M.J. once saw her then five or six-year-old

11

son Carlos lighting a piece of toilet paper on fire with a lighter, but she spoke to him and they "didn't have any more problems with that."

## D. Mother's Defense

Mother's sister, K.D., testified for mother's defense that she had been around A.Y. his entire life, had cared for him on November 4 and 11, 2014, and also saw him on November 18. She did not see any "serious injuries" on A.Y.'s body prior to his November 21 hospitalization other than a "scrape or something" from a fall, and specifically saw no smiley face injuries on the child, even though he liked to run around in a diaper. A.Y. had no appetite issues when she cared for him and "was his typical self" on November 18.

Dr. Vivek Puppala testified as the emergency room physician who evaluated A.Y. for his testicular issue on November 8, 2014. When Dr. Puppala evaluated A.Y., he found no fever, no elevated white blood cell count, no abdominal pain, and no lesions or rashes on the skin. He noted no burn marks or lacerations on A.Y. Rather, the child appeared in good health other than swelling and redness in the scrotum area for which the doctor referred A.Y. to a urologist due to concern for testicular torsion. Ultimately, after surgery, the urologist concluded that A.Y. had a bruised testicle rather than a twisted testicle as was feared.

## E. Verdict and Sentencing

The case went to the jury with final instructions on March 7, 2019. On March 8, 2019, the jury returned verdicts of not guilty on two of Wilson's child abuse counts—count 2 relating to the skull fracture and count 4 involving the alleged spleen injury. The jury found Wilson guilty of torture (count 1) and the remaining child abuse counts—count 3 involving subdural head trauma apart from the skull fracture and count 5 related to the BIC lighter burns. It also found the related great bodily injury enhancement true

12

with respect to counts 3 and 5. On the prosecutor's motion, the trial court dismissed the prior conviction and prior prison term allegations. Mother was acquitted of the sole child endangerment count against her.

On May 17, 2019, the trial court sentenced Wilson to life with the possibility of parole on the torture count and a concurrent term of 12 years with respect to count 3 involving the subdural head trauma. Imposition of sentence under count 5 was stayed pursuant to section 654. This timely appeal followed.

## II.

## DISCUSSION

### A.    *Denial of Requests for Continuance*

Wilson first argues that the trial court erred in denying his attorney's repeated requests for a continuance at the beginning of trial. According to Wilson, the trial court's actions in this regard not only violated statutory law but also constituted a violation of his constitutional rights to due process and equal protection. We reject Wilson's claims.

### 1.    *Additional Background*

The felony complaint in this matter was filed in February 2015. On February 17, 2015, Wilson retained counsel and waived time. The preliminary hearing was then continued, once on the court's own motion (to March 2015) and three times at Wilson's request (to May, June, and August 2015). After the August 2015 preliminary hearing, Wilson indicated he no longer wished to waive time. Sean Swartz, a deputy for the alternate public defender, first appeared as Wilson's defense counsel at Wilson's arraignment in September 2015. Time was again waived, and the matter was continued by the court to November 2015 for a section 995 motion to set aside the information. On February 1, 2016, after denying the newly assigned

13

prosecutor's request for a 2-week continuance to get up to speed on the case, the trial court denied the section 995 motion and continued the matter to February 11 for trial setting. Time continued to be waived. The February 11 setting date was subsequently continued to March 30, 2016, at Wilson's request.

Trial in this matter was initially set for September 2016 but was continued for good cause to February 2017 based on a personal conflict for the prosecution. The February 2017 date was vacated by the court in December 2016. In March 2017, the court reset the trial to October 2017 to accommodate the defendants' anticipated motions to sever. However, in September 2017 the trial date was vacated upon Wilson's written motion to continue in order to allow for investigation of possible previous child welfare incidents involving A.Y. and his half-brother, Anthony. Issues with respect to the motions to sever were still ongoing, but the court finally denied the severance motions in October 2017 and set the trial for March 2018. In January 2018, the court again vacated the trial in the face of discovery disputes among counsel and Wilson's attendant motion to compel.

In February 2018, Wilson withdrew his time waiver and trial was set for May 2018. However, continuing discovery issues prompted Wilson to again waive time in April, and the May 2018 trial date was vacated and eventually reset for August 2018. Also in April, Schwartz filed an extensive trial management packet for Wilson, including motions in limine, and those motions were set for July 2018. In July, the court granted Wilson's motion to continue the trial to September to accommodate a surgical procedure for Schwartz. The prosecution submitted its trial management packet in September 2018, including its motions in limine. However, shortly before the

September trial date, the court again continued the matter at defense counsel's request, ultimately resetting the trial for January 2019.

In November 2018, Wilson again withdrew his time waiver, and the matter was confirmed for trial in January 2019. However, in December 2018, mother's attorney was appointed to the bench and the public defender's office requested a six-month continuance to allow new counsel to prepare. Schwartz objected to such a long continuance given that Wilson was in custody. The court ultimately concluded that 60 days was reasonable and continued the trial to February 11, 2019. Shortly thereafter, the prosecutor moved for a two-week continuance of the trial date because she was scheduled to handle another no-time-waived case with a last day of February 11. At the hearing on the motion on January 10, 2019, Schwartz indicated that Wilson was still not waiving time, the parties had "come up to the verge of trial readiness many times," and Wilson wanted "to proceed with his trial and receive his due process." He specifically objected to the prosecutor receiving a 10-day continuance pursuant to section 1050, subdivision (g)(2). The court indicated that it understood and would "rather not vacate or move this trial date," and Schwartz agreed. The court then considered various plans to expedite the other case. As it turned out, the other trial did not cause a conflict.

On February 1, 2019, the prosecution filed an amended witness list and motions in limine. The trial court stated that motions in limine would be heard on February 11 and the jury panel would be brought in on February 13. The trial began as scheduled on February 11. The court indicated that it had heard Schwartz was still in a competency trial—with the next hearing on the afternoon of February 13— so it had coordinated with the other judge and "both communicated a willingness to bend schedules to accommodate needs."

15

This court's plan was to do two rounds of hardships that day and another the morning of February 13 (after the February 12 holiday), continuing voir dire to Tuesday, February 19 (after the Monday February 18 holiday). It noted that the case was in a no-time waiver status at Wilson's insistence. Nevertheless, Schwartz objected to "being forced to proceed with any portion of jury selection" while he was engaged in a competency trial in a murder case. He argued that engagement in another trial was good cause for purposes of his client's speedy trial rights. And he asserted that dividing his attention between two serious criminal matters would deny both of his clients their constitutional trial rights.

The court repeatedly noted that large jury panels "are extraordinar[ily] difficult to get and to manage," which could further delay this trial for a month to six weeks. It characterized Schwartz as a seasoned attorney, stressed that the next day was a court holiday in which Schwartz could regroup, and reminded Schwartz that it had put off voir dire in this case until the next week. When Schwartz commented that they were also scheduled to do in limines that day, the court stated they would "start the discussion just to get focused." The court then denied the continuance request, commenting that it had "detailed discussions" with Wilson the previous week, and he "want[ed] to go to trial."

The court proceeded to discuss the nature of the charges, give an overview of what it saw as the big issues in the case, have preliminary conversations about various evidentiary issues, and deal with some noncontroversial motions. It reviewed hardships with the parties. When the court turned to witness lists, Schwartz objected, arguing: "This is what I was saying. The process we are going through today is more than just hardships. We are dealing with the whole entire case." The court responded: "I'm trying

16

to get the universe of issues in front of us and I will allow you to revisit this." The court handled the hardships that had not been immediately granted. It then continued its discussion of the in limine motions and handled the hardships from the next panel of potential jurors. The court told the parties not to worry about opening statements or witnesses until February 25.

On the next court day, February 13, Schwartz renewed his motion for a continuance focusing on the fact that, pursuant to section 1050, subdivision (g), a prosecutor in two simultaneous trials would be entitled to a 10-day continuance. The trial court responded that it had already slowed the trial down to accommodate Schwartz; that there had not been "a single hardship" that was contested; and that, as it had previously mentioned, if Schwartz needed more time to brief or address any particular issue, the court would accommodate him, subject only to possible limitations during voir dire with respect to certain topics. The court noted that the rules regarding continuances were not as simple as Schwartz stated and suggested that any complaint about section 1050, subdivision (g) should be directed to the Legislature rather than the court.

Trial resumed six days later, on Tuesday, February 19, 2019, with both Schwartz and the prosecutor having filed additional briefing on certain evidentiary issues. Schwartz's other trial had concluded on February 15. Nevertheless, Schwartz filed a motion again requesting to continue the trial, this time based on the receipt of late discovery, including recordings of statements made to the police by Wilson and mother and a cell phone tower extraction from mother's cell phone. The prosecutor stated she turned the discovery materials over when she received them. While she acknowledged that certain comments in Wilson's statement were inculpatory, the interview was summarized in a 2015 police report that had already been provided to

17

Schwartz (and which stated the recording existed), so she did not believe the information was new. The court repeatedly castigated the prosecution for failing to locate and disclose the materials in a timely fashion, querying why these issues "weren't litigated a year ago or more." But it also criticized Schwartz, noting that if Schwartz had a written report saying there was a recording, why "not two years ago were you [not] demanding this? Why not a year ago were you not demanding this?" In the end, the court denied the continuance but indicated it would consider barring the late-discovered evidence.

Thereafter, on the first day of actual trial testimony, February 25, 2019, Schwartz renewed his continuance motion and moved for a mistrial on the basis of the late discovery. The court denied the motion for mistrial, stating: "I do not think it's appropriate to undertake such representation, insist on going to trial on a no time waiver basis[,] assemble all of these resources[,] then in the middle of it in an effort to derail it, . . . start asserting these things." The court indicated it would be mindful of the issues during the trial and "in a New York minute mis-try this case if it appear[ed] to [it], on its face, that the rights of the defendants [were] not being adequately represented."

### 2. *No Abuse of Discretion on This Record*

A criminal trial may be continued only upon a showing of good cause. (*People v. Reed* (2018) 4 Cal.5th 989, 1004 (*Reed*), citing § 1050, subd. (e).) When granting or denying a continuance motion during trial, the trial judge considers "not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." (*People v.*

*Zapien* (1993) 4 Cal.4th 929, 972.) " 'The decision whether or not to grant a continuance of a matter rests within the sound discretion of the trial court. [Citations.] The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked.' " (*People v. Peoples* (2016) 62 Cal.4th 718, 749.) Rather, "discretion is abused only when the court exceeds the bounds of reason, all things being considered." (*People v. Beames* (2007) 40 Cal.4th 907, 920.)

" '[T]he denial of a continuance may be so arbitrary as to deny due process.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 650.) While a trial court " 'may not exercise its discretion "so as to deprive the defendant or his attorney of a reasonable opportunity to prepare," ' " every denial of a request for more time cannot be said to violate due process. (*Ibid.*) When considering whether a constitutional violation has occurred, "we focus particular attention on the reasons actually given for the request." (*Reed*, *supra*, 4 Cal.5th at p. 1004.) Generally speaking, however, a determination that the trial court acted within its broad discretion in denying a continuance forecloses a defendant's constitutional due process claims. (See *People v. Riggs* (2008) 44 Cal.4th 248, 296–297.)

Wilson has failed to establish that the trial court abused its discretion or violated his constitutional rights by denying his attorney's repeated continuance requests. The procedural history of this case reveals the number of times the case was ready to proceed to trial yet was repeatedly continued at the request of both the defense and the prosecution. With respect to Schwartz needing more time to prepare because he was simultaneously finishing a competency trial while starting this trial, the trial judge here accommodated Schwartz's schedule. The overlap of the two trials was

19

minimal; this court coordinated schedules with the judge in the other matter; it handled only hardships and preliminary discussions regarding in limine issues and trial management on February 11 and the morning of February 13, postponing voir dire until the second week and opening statements and witnesses until the third; and the time period at issue included two court holidays (February 12 and 18) and two weekends. (See *Fuiava*, *supra*, 53 Cal.4th at p. 650 ["Even assuming counsel was required to complete his fine-tuning in the evenings during the trial, this would not have been so unusual or burdensome that we would conclude the trial court's decision was outside the bounds of reason."].) Moreover, Schwartz was a seasoned attorney who had been Wilson's defense counsel for over three years at the time of the February 2019 trial, and he had researched and filed his own motions in limine and received the prosecution's motions months before the start of trial.

As to the admittedly late discovery from the prosecution, (disclosed on February 6 but which Mr. Schwarz claimed he did not receive until February 11), summaries of the recorded police interrogations had previously been provided to the defendants, making it unlikely anything "new" would be discovered; the parties received the materials several weeks before opening statements, to the extent further investigation was necessary; the prosecution indicated it would not be offering the cell phone extraction data as evidence, and the trial court indicated it would consider excluding the materials. (See *Fuiava*, *supra*, 53 Cal.4th at pp. 649–650 [noting in denying a continuance that counsel was an "experienced attorney" and that there would be " 'periods of dead time' " during the trial for further investigation and preparation]; see also *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1231 [continuance to develop additional mitigation evidence denied where the

additional evidence was largely cumulative], abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Finally, and importantly, Wilson, himself, had made clear to the court that he "want[ed] to go to trial." The court noted on February 11, "We are in a no-time waiver status and today is the last day, and that is at Mr. Wilson's insistence." Schwartz confirmed that Wilson "indicate[d] that he wanted to proceed today." Under such circumstances, Schwartz did not have the authority to waive time over his client's objection. (*People v. Lomax* (2010) 49 Cal.4th 530, 553 [" 'appointed defense counsel lacks authority to waive his or her client's statutory speedy trial rights when the client personally *objects* to a continuance and the sole reason for the continuance is defense counsel's obligation to another client.' " ].) In denying the continuances, the court properly weighed Wilson's wishes, any mitigated hardship to Schwartz, and the burden on the court given the difficulty of getting and managing the large jury pools needed for this case which, by Schwartz's own admission, had "come up to the verge of trial readiness many times." The trial court did not abuse its discretion in proceeding as it did on these facts. Certainly, there was no violation of due process.[6]

### 3.    *No Equal Protection Violation*

Wilson's additional claim in this context—that the denial of Schwartz's continuance request at the start of trial violated his equal protection rights— is easily dismissed. Pursuant to subdivision (g)(2) of section 1050, "good cause" for continuing a trial up to a maximum of 10 court days exists in

---

[6] *People v. Sutton* (2010) 48 Cal.4th 533, relied upon by Wilson both in the trial court and on appeal, does not help him as that case merely held, under its particular facts and circumstances, that the trial court did not abuse its discretion by finding that defense counsel's participation in another trial constituted good cause for a brief continuance. (*Id.* at pp. 540–544, 557.)

certain serious criminal matters, such as those involving murder, domestic violence, child abuse, and stalking, if "the prosecuting attorney assigned to the case has another trial, preliminary hearing, or motion to suppress in progress in that court or another court." According to Wilson, the trial court's refusal to continue this matter so that he could complete his ongoing competency trial violated principles of equal protection because, under similar circumstances, the prosecutor would have been entitled to a continuance. We review such constitutional claims de novo. (*People v. Morales* (2021) 67 Cal.App.5th 326, 345.)

As Wilson, himself, acknowledges, however, " ' "[t]he concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253.) Thus, "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530.) While the two groups at issue need not be similarly situated for all purposes, "we ask at the threshold whether two classes that are different in some respects are sufficiently similar *with respect to the laws in question* to require the government to justify its differential treatment of these classes under those laws." (*People v. McKee* (2010) 47 Cal.4th 1172, 1202, italics added.)

Wilson concedes that the two groups at issue here—prosecutors and defense attorneys—are dissimilar in many respects, but he argues that they are similarly situated for purposes of continuances under section 1050. We disagree. As our colleagues in Division Five of this District have concluded after surveying relevant legislative history, "the purpose of section 1050(g)(2)

22

is to ensure that prosecutors assigned to certain sensitive or complicated cases remain on those cases, notwithstanding scheduling conflicts that would otherwise force a replacement prosecutor to assume responsibility for the case." (*Burgos v. Superior Court* (2012) 206 Cal.App.4th 817, 829.)  For example, with respect to sexual assault and child abuse cases, the legislative history states: " ' "Because of the sensitivity of sexual assault and child abuse cases and the need for a rapport between the victim and attorney, a forced change of attorney is traumatic for the victim and a betrayal of a promise that is clearly both expressed and implied of having the victim deal with only one prosecutor.  Often the victim will refuse to deal with a new attorney, forcing a dismissal of the case which is harmful to the victim and to society." ' " (*Ibid.*)  The legislation was thus meant to encourage and protect the vertical prosecution concept in these cases.  (*Ibid.*; see also Sen. Com. on Pub. Safety, Analysis of Sen. Bill No. 69 (1999-2000 Reg. Sess.), as amended March 23, 1999, p. 2 [including stalking in the list of section 1050, subd. (g)(2) offenses under the following rationale: "Stalking victims, who are often women, should have some feeling of security when their case[s] [are] being handled.  Vertical prosecution of stalking cases is extremely important due to the intricate nature, the long-term histories of these cases, and the potential of violence to the victim if the cases are not handled properly."].)[7]

There is no question that defendants in criminal prosecutions are entitled to vigorous representation by competent counsel.  However, the concerns regarding public safety and the sensitive treatment of crime victims

---

[7] We grant the Attorney General's unopposed request that we take judicial notice of certain committee reports culled from the legislative history of section 1050, subdivision (g)(2).  (Evid. Code, §§ 452, subd. (c), 459, subd. (a); see *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30–32.)

which animate subdivision (g)(2) of section 1050, allowing certain continuances for prosecutors, are plainly inapplicable to defense counsel. The two groups are simply not similarly situated in this context. We see no constitutional violation.

## B.  *Denial of Severance Motions & Sixth Amendment Issues*

Wilson next asserts that the trial court erred in refusing to sever his trial from mother's because: (1) the court had no power to join the trials in the first place; (2) the two trials should have been severed due to conflicting defenses; and (3) the admission of some of mother's out-of-court statements violated his Sixth Amendment rights under *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*) and *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). Although the Attorney General concedes *Aranda/Bruton* error occurred here, we disagree. We conclude, in contrast, that certain of the statements at issue were inadmissible under *Crawford*. Nevertheless, we find any such error harmless and see no other error in the trial court's joint trial decisions. Thus, all of Wilson's severance arguments fail.

### 1.  *Additional Background*

Wilson filed a motion to sever in June 2017, arguing that: (1) the prosecutor could offer statements in a joint trial that would violate his Sixth Amendments rights under *Aranda/Bruton*; (2) he and mother had mutually antagonistic defenses; and (3) the weakness of the case against mother could cause the jury to convict him, because the case against him was stronger and the jury would want to find someone responsible for A.Y.'s injuries.[8] After

_____

[8] Mother had filed a similar severance motion in December 2016, arguing that the strong case against Wilson could bolster the weak case against her and that the jury might convict her due to guilt by association.

opposition from the prosecution, the trial court first considered severance in July 2017. The court deferred consideration of any *Aranda/Bruton* issues, indicating that the challenged statements might be able to be sanitized and that it "need[ed] to look at the entirety of these statements and figure out the context and then ask you some questions about what is going to be easily established anyway." The prosecutor concurred, noting that mother's statements to the police were "confirmed and consistent" with statements Wilson, himself, gave. She agreed with partial redaction as a solution. The court ordered the prosecutor to submit a transcript of all the statements at issue and requested that the parties meet and confer.

With respect to antagonistic defenses, both defendants anticipated they would blame each other for A.Y.'s injuries as his two adult caretakers. The court, however, denied severance on this basis. While it sympathized with the inherent difficulties in such a situation, the court noted "the presumption is we are supposed to keep cases together." Indeed, the court considered the presumption "heightened in this case because of the number of resources, medical and otherwise that are going to be involved in just coming in and simply discussing the injuries themselves, the things associated with the child." Moreover, the court believed any issues in this context could generally be "addressed by way of admonitions, limiting instructions to the jury."

The court held a second hearing on Wilson's motion to sever in October 2017. The prosecutor stated that she had been reviewing all the discovery in this case and that, in her view: "[Mother] has never really thrown [Wilson] under the bus. She's never implicated him. The whole time the position she's taken is, you know, I just can't believe that he would do that. I don't think that he would do that. And in terms of placing him at the home, he places himself home." The prosecutor went on to argue that one defendant's

25

statement inculpating the other defendant would not violate *Bruton* if the inculpated defendant also made the same statement. The court concluded that it did not think there was a "need to sever because there's something so awful in these statements that I can't solve it." As an example, the court noted: "[I]f you reduce these statements, [Wilson] saying yeah, he was there watching the kids, [mother] saying she was at work all the time, leaving the kids with him, I don't see a significant [*Aranda/Bruton*] problem there."

In his April 2018 trial management packet, Wilson incorporated his previous motion to sever, without any additional or updated argument. After opening statements on February 25, 2019, Wilson's defense counsel moved for a mistrial, arguing that mother's opening statement made it "clear" that the defendants had antagonistic defenses because her statement "put forward a complete blame on" Wilson. The trial court denied the motion, stating that Wilson's opening statement had "invited" the comments made by mother's attorney.

### 2. *Legal Framework*

"Our Legislature has expressed a strong preference for joint trials." (*People v. Souza* (2012) 54 Cal.4th 90, 109 (*Souza*).) "Joinder is ordinarily favored because it avoids the increased expenditures of funds and judicial resources that may result from separate trials" and, therefore, " 'is the course of action preferred by the law.' " (*People v. Simon* (2016) 1 Cal.5th 98, 122 (*Simon*).) Indeed, the California Constitution expressly provides that it "shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature or by the people through the initiative process." (Cal. Const., art. I, § 30, subd. (a).) Section 1098 provides in pertinent part: "When two or more defendants are jointly charged with any

26

public offense, whether felony or misdemeanor they *must be tried jointly*, unless the court order[s] separate trials." (Italics added.)

The court's discretion to order severance of defendants is guided by certain nonexclusive factors, " 'such that severance may be appropriate "in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony." ' " (*Souza*, *supra*, 54 Cal.4th at p. 110.) With respect to conflicting defenses, "[s]everance is not required simply because one defendant in a joint trial points the finger of blame at another. ' " 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.' " [Citation.] When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.' " (*People v. Homick* (2012) 55 Cal.4th 816, 850 (*Homick*).)

To the extent Wilson's claims rely on statutory interpretation, our review is de novo. (*People v. Tirado* (2022) 12 Cal.5th 688, 694 (*Tirado*).) In contrast, we review a trial court's decision not to sever for abuse of discretion based on the record before it when the motion is heard. (*People v. Elliot* (2012) 53 Cal.4th 535, 552.) Whether a trial court abused its discretion in denying severance depends on the particular circumstances of each case. (*Simon*, *supra*, 1 Cal.5th at p. 123.) "Where . . . the statutory requirements for joinder are met, a defendant must make a 'clear showing of prejudice' to establish that the trial court abused its discretion in denying the motion." (*Id*. at pp. 122–123.) Moreover, "[s]imply because the prosecution's case will

27

be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair." (*People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 379 (*Wheeler*).) "Indeed, important concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against ensuing charges." (*Ibid.*)

### 3. *Joinder Proper Under Section 1098*

Wilson first argues that two defendants are required to be tried jointly pursuant to section 1098 only if they "are jointly charged with any public offense." As stated above, Wilson was charged with torture (count 1) and four counts of child abuse (counts 2 through 5) in this case, while mother was charged in count 6 with child abuse under a child endangerment theory. Relying on *People v. Ortiz* (1978) 22 Cal.3d 38, 43 (*Ortiz*)—which construed section 1098 "to mean that a defendant may not be tried with others who are charged with different crimes than those of which he is accused unless he is included in at least one count of the accusatory pleading with all other defendants with whom he is tried"—Wilson argues that the trial court erred as a matter of law by joining his case with mother's when they were not jointly charged in any count of the amended information. The resolution of this issue is not as simple as Wilson suggests.

In *Ortiz*, Flemings, Buris, and Rivens were charged in count I with armed robbery after an alleged drug sale gone bad led to a questionable allegation from the drug dealer that the three had held him up at knife and gun point, tied him up, and stolen his television. Rivens and Ortiz were charged in count II with a separate armed robbery from the same day during which Rivens and Ortiz entered a mini mart together and robbed the owner while Ortiz pointed a handgun at her. (*Ortiz, supra*, 22 Cal.3d at pp. 40–42.)

After Ortiz's severance motion was denied, Flemings, Buris, and Rivens were acquitted on count I, Ortiz was convicted on count II, and a mistrial was declared as to Rivens on count II after the jury failed to reach a verdict. (*Id.* at p. 42.)

In support of its conclusion referenced above that a defendant may not be jointly charged unless he or she "is included in at least one count of the accusatory pleading with all other defendants," the *Ortiz* Court relied on *People v. Davis* (1940) 42 Cal.App.2d 70, which held that joinder was improper when the charges involved " 'separate and distinct crimes, occurring at different times, against different persons, and . . . charged against different defendants.' " (*Ortiz, supra*, 22 Cal.3d at p. 44.) Our high court also cited *People v. O'Leary* (1955) 130 Cal.App.2d 430, which followed *Davis* in similarly concluding that joinder is inappropriate where " '[e]ach count involved a separate crime committed on a different date against a different victim.' " (*Ortiz* at p. 44.) Finally, the *Ortiz* Court cited with approval *People v. Biehler* (1961) 198 Cal.App.2d 290, an appellate decision which opined, among other things, that while "[a] defendant may be prejudiced if forced to stand trial on one charge with a codefendant or codefendants who are charged with a distinct and unconnected offense," joinder of distinct charges against separate defendants is permissible "when the crimes charged arose out of a single set of circumstances." (*Id.* at pp. 294, 296; see *Ortiz*, at p. 45.)

After reviewing the case law relied upon by the Supreme Court in *Ortiz*, the Second District has concluded: "We are convinced that the Supreme Court did not intend, in establishing a rule requiring separate trials of defendants not jointly charged, to include within the purview of that rule defendants charged with crimes arising out of a single set of circumstances. The evil sought to be avoided by *Ortiz* was the prejudicial impact of irrelevant

29

evidence." (*People v. Hernandez* (1983) 143 Cal.App.3d 936, 939–940.) And Division Three of this District has since followed *Hernandez* in finding *Ortiz* inapplicable in cases "where all codefendants, whether jointly charged or not, committed offenses at the same time and place and as part of the same transaction." (*People v. Wickliffe* (1986) 183 Cal.App.3d 37, 40.) We agree with the reasoning of both *Hernandez* and *Wickliffe* and find the exception to *Ortiz* they articulate applicable in this case where both mother and Wilson were charged with interrelated crimes arising out of the abuse of a single victim, young A.Y. We thus reject Wilson's assertion that the joinder of his case with mother's constituted legal error.

### 4. *No Abuse of Discretion in Denial of Severance Motions*

Wilson next argues that, even if his case was properly joined with mother's, the trial court should have exercised its discretion to order separate trials given their antagonistic defenses. However, as stated above, "[s]everance is not required simply because one defendant in a joint trial points the finger of blame at another." (*Homick*, *supra*, 55 Cal.4th at p. 850.) Indeed, "[i]f the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials 'would appear to be mandatory in almost every case.' " (*People v. Hardy* (1992) 2 Cal.4th 86, 168.) " 'Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty.' " (*Ibid*, italics added.) Under another formulation, "[a]ntagonistic defenses do not warrant severance unless the acceptance of one party's defense would preclude acquittal of the other." (*People v. Burney* (2009) 47 Cal.4th 203, 239.) And, finally, severance is only required when purportedly

antagonistic defenses are "so irreconcilable that only one could be guilty." (*People v. Lewis* (2008) 43 Cal.4th 415, 461, overruled on another ground as stated in *People v. Black* (2014) 58 Cal.4th 912, 919.) Wilson is unable to meet any of these standards.

Here, mother argued that she was not criminally negligent for failing to protect A.Y. because she did not see anything, and she knew nothing. Wilson, in contrast, argued that he did not commit the abuse; that A.Y. was actually suffering from viral encephalitis; and that others, including children and additional caretakers, committed any abuse. These defenses are not mutually exclusive. Each could be true, leading to the acquittal of both defendants. In other words, the acceptance of mother's defense would not have required a finding that Wilson was guilty. And, in fact, the jury accepted portions of both defenses, acquitting Wilson of some charges and mother of child endangerment. Under such circumstances, a joint trial was not inappropriate.

Finally, mother's opening statement does not change our conclusion. Although it is true mother's attorney made several statements implicating Wilson—that "some types of betrayal . . . are very, very difficult to imagine," that Wilson and the children "were [the only ones] in the house," and that "[i]n hindsight, [her] trust was misplaced"—counsel connected each statement to a disavowal of knowledge: Mother "did not see what happened next;" she "did not know that this was coming;" and when mother walked out the door on November 21, she "did not know what was going to happen." In other words, her defense was that she was not criminally negligent, and she did not know what happened. It was not so antagonistic with Wilson's claims that the trial court abused its discretion in concluding that a joint trial was warranted.

31

## 5. *Allegations of Sixth Amendment Error*

Wilson finally argues that his constitutional confrontation rights were violated by a joint trial under *Aranda/Bruton* and *Crawford* because the trial court allowed the admission of certain incriminating pre-trial statements made by mother, even though he had no opportunity to cross-examine her. Although Wilson is never entirely clear on this point, he appears to contest pre-trial statements made by mother to the effect that: (1) she was not home when 911 was called for A.Y.; (2) Wilson was the only adult home that morning; (3) A.Y. was healthy and active before she left for work on November 21, 2014; (4) she had seen no injuries or burns on A.Y. prior to November 21, other than normal bruises and scrapes; (5) she saw no injuries on A.Y. because she had not been bathing him, while Wilson frequently bathed him; (6) they had no visitors to their home the night before A.Y.'s hospitalization; (7) Wilson had lived with A.Y. since the child was an infant and was his caregiver during November 2014; (8) A.Y. had not complained about head or stomach pain prior to November 21; and (9) she did not know how the injuries occurred. We address each of Wilson's constitutional claims in the context of these statements.

In *Bruton*, *supra*, 391 U.S. 123, the United States Supreme Court held that—because jurors cannot reasonably be expected to ignore one defendant's confession that incriminates a second defendant when determining the latter's guilt, even when a limiting instruction is given—admission of such a confession at a joint trial generally violates the confrontation rights of the second defendant, absent the opportunity for cross-examination. (See *People v. Fletcher* (1996) 13 Cal.4th 451, 455, citing *Bruton*, at pp. 126–137.) As the *Bruton* Court explained: "[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the

consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. [Citations.] Such a context is presented here, where the *powerfully incriminating* extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial." (*Bruton*, at pp. 135–136, italics added.)[9] In *Richardson v. Marsh* (1987) 481 U.S. 200 (*Marsh*), the United States Supreme Court revisited *Bruton,* characterizing its holding as a "narrow" one and clarifying that *Bruton* was inapplicable where "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial." (*Id.* at pp. 207–208.) Thus, post-*Marsh*, "[t]he class of inferentially incriminating statements under *Bruton* is limited to 'obvious[]' ones, 'inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.' " (*People v. Montes* (2014) 58 Cal.4th 809, 867 (*Montes*).)

As an example, in *People v. Bell* (2019) 7 Cal.5th 70, the defendant was convicted of robbing and fatally shooting a convenience store clerk while his girlfriend waited in the car. (*Id.* at p. 79.) During the guilt phase of the trial, a detective related statements made by the girlfriend that the car had been washed after the shooting. (*Id.* at p. 99.) In considering the admissibility of the statements, the Supreme Court noted that *Aranda/Bruton* was not applicable since the girlfriend had died before trial and thus the two were not

---

[9] The California Supreme Court had reached a similar conclusion several years before *Bruton* on non-constitutional grounds. (*Aranda, supra,* 63 Cal.2d at pp. 528-530; accord *Fletcher, supra,* 13 Cal.4th at p. 455.) However, to the extent *Aranda* "requires the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8." (*Fletcher*, at p. 465.) Thus, the issue before us is one of federal constitutional law.

jointly tried.  (*Id.* at pp. 81, fn.3 & 99.)  However, the Court went on to state, albeit in dicta: "In any event, [the girlfriend's] statements about washing the car were not ' "facially incriminating" of defendant and so would not run afoul of the rule.' "  (*Id.* at p. 99.)

Similarly, in *People v. Gallardo* (2017) 18 Cal.App.5th 51 (*Gallardo*)—a case involving a joint drive by shooting of rival gang members by four co-defendants—the Second District rejected the argument that certain statements made by co-defendant Ramos to law enforcement violated *Aranda/Bruton*.  (*Id.* at pp. 55, 79–81.)  Specifically, the appellate court concluded: "Ramos's statements that he drove to the recycling facility in a gray Ford Explorer, that he entered the passenger side of the vehicle when leaving the facility and that he then followed a white Expedition to Santa Fe Avenue did not 'facially incriminate' [two co-defendants], nor did the statements create an 'obvious inference' that those codefendants participated in the shooting.  Ramos never admitted his vehicle or the vehicle he followed were involved in the shooting.  Moreover, Ramos did not make any specific reference to any of his codefendants, or provide any other identifying information about whom he was driving with, or whom he was following.  To the extent Ramos's statements were incriminating toward [the two co-defendants], they became so only when linked with a substantial amount of additional evidence related to the crimes."  (*Id.* at pp. 80–81.)

Under a comparable analysis, no *Aranda/Bruton* error occurred here.  Far from being facially incriminating, mother's challenged statements as detailed above are simply basic comments regarding her living situation with Wilson and the general health of A.Y. prior to the injuries the toddler was hospitalized for in November 2014.  Indeed, if mother's "confession" had been the first evidence introduced at trial in this matter, the only obvious

34

inference that the jury would have been able to make from her statements was that A.Y. had been somehow injured and mother did not know how the injuries occurred. (See *Montes, supra,* 58 Cal.4th at p. 867.) To the extent mother's statements were incriminating, they became so only when linked to other evidence regarding the scope of the injuries and their likely timing.

Wilson's challenge to mother's statements under *Crawford, supra,* 541 U.S. 36, is more complicated. *Crawford* held that "the admission of 'testimonial' out-of-court statements violates a criminal defendant's confrontation rights unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination [citation], or waived that right by his own wrongdoing." (*People v. Leon* (2015) 61 Cal.4th 569, 602–603 (*Leon*).) In contrast, "the admission of 'nontestimonial' statements 'is the concern of state and federal rules of evidence, not the Confrontation Clause.' " (*Gallardo, supra,* 181 Cal.App.5th at p. 66, citing *Crawford, supra,* 541 U.S. at p. 68 and quoting *Michigan v. Bryant* (2011) 562 U.S. 344, 359.)

"Although the Supreme Court has not settled on a clear definition of what makes a statement testimonial, we have discerned two requirements. First, 'the out-of-court statement must have been made with some degree of formality or solemnity.' [Citation.] Second, the primary purpose of the statement must 'pertain[] in some fashion to a criminal prosecution.' " (*Leon, supra,* 61 Cal.4th at p. 603.) Thus, "the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*).) Moreover, "the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation." (*Ibid.*)

As detailed in our factual recitation above, mother made the statements Wilson objects to in various contexts and to various people, including the police, hospital and child welfare social workers, and Dr. Gilgoff. We agree that all of mother's statements to law enforcement— whether at the police station or in the hospital—were testimonial and thus should have been excluded under *Crawford*. (*Crawford, supra,* 541 U.S. at p. 52 ["[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard"]; *Cage, supra,* 40 Cal.4th at p. 984 ["sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses;" statement to police in hospital waiting room testimonial].) However, we conclude that mother's statements to social workers Harris, Manuel, and Montano were not testimonial, as they were made informally and for the primary purpose of protecting the welfare of A.Y. rather than "to establish or prove some past fact for possible use in a criminal trial." (*Cage*, at p. 984; see *Ohio v. Clark* (2015) 576 U.S. 237, 246–247 (*Clark*) [statements of child to preschool teachers involving physical abuse not testimonial where the setting was informal, the "first objective" was to protect the child, and there was "no indication that the primary purpose of the conversation was to gather evidence for [the abuser's] prosecution"].)

As for Dr. Gilgoff, she spoke with both mother and Wilson informally on November 24, 2014, shortly after A.Y.'s hospitalization and while his condition was still quite serious, in an attempt to figure out the underlying causes for the child's life-threatening situation. While mother's statements to Dr. Gilgoff were perhaps not obtained *primarily* for the purpose of A.Y.'s medical treatment and may have been elicited, in part, in contemplation of a

36

potential criminal prosecution at a later time, that is not the test. Rather, we also conclude that Dr. Gilgoff' spoke with mother for the primary purpose of protecting A.Y.'s welfare, which included potentially obtaining important information for the child's treatment team. Thus, mother's statements to the doctor were also nontestimonial.[10] (*Clark, supra,* 576 U.S. at pp. 246–247; cf. *Cage, supra,* 40 Cal.4th at pp. 987–988 [report of abuse to treating doctor nontestimonial where the primary purpose of the questioning was medical treatment, even though doctor was a mandated reporter].)

Under these circumstances, we find any error in admitting mother's contested statements made to the police harmless beyond a reasonable doubt, because the gist of all of those statements was also conveyed either by Wilson's own admissions or in mother's nontestimonial comments to social workers or medical personnel. (*Idaho v. Wright* (1990) 497 U.S. 805, 823–824 ["the presence of corroborating evidence . . . indicates that any error in admitting the statement might be harmless"]; accord, *Wheeler, supra,* 60 Cal.4th at p. 395 [considering whether admission of recorded statement in violation of *Crawford* was harmless "because other independent evidence proved the assertions contained in the tape"]; *Cage, supra,* 40 Cal.4th at pp. 991–994 [same].) Although Wilson rebuffs the trial court's conclusion in this case that both defendants' statements were for the most part, admissible as

---

[10] We find *People v. Vargas* (2009) 178 Cal.App.4th 647, cited by Wilson, distinguishable. In *Vargas,* the appellate court concluded that statements made by a rape victim to a forensic nurse examiner during a sexual assault exam were testimonial where the victim was informed that the exam was being conducted to preserve evidence for release to law enforcement and the exam included both a very detailed forensic interview conducted "according to a rigorous, statutorily mandated format" and the preservation of clothes and collection of photographic evidence for transmission to the police. (*Id.* at pp. 652, 655–657, 660–661.)

admissions, this was a true statement of the law with respect to all of the defendants' many nontestimonial remarks. (*Gallardo, supra*, 181 Cal.App.5th at p. 66 ["the admission of 'nontestimonial' statements 'is the concern of state and federal rules of evidence, not the Confrontation Clause' "].)[11]  Indeed, even if we had found *Aranda/Bruton* error in this case, it would have been limited to mother's *testimonial* statements. (*People v. Cortez* (2016) 63 Cal.4th 101, 129 [finding no *Bruton* error where challenged statement was nontestimonial]; *Gallardo, supra*, 181 Cal.App.5th at pp. 68–69 [noting *Cortez* resolved the unsettled issue of whether *Crawford* limited the *Bruton* rule to testimonial statements].)

Turning to the specific statements here at issue and without being exhaustive, mother's statements that Wilson was the only adult home on November 21 and that she, specifically, was not present at the time of the 911 call, were confirmed by Wilson's statement to Detective Mustard as well as by mother's boss, who testified that he drove her to the hospital. Statements that Wilson had lived with A.Y. since he was young and had been the child's primary caretaker in November 2014 were made by mother to child welfare social worker Manuel and by Wilson to hospital social worker Harris. There was extensive evidence that A.Y. had been generally healthy and active up to

---

[11] Our conclusions also resolve Wilson's claim that introducing mother's statements through Dr. Gilgoff's testimony violated Wilson's constitutional rights under *People v. Sanchez* (2016) 63 Cal.4th 665. *Sanchez* precludes an expert's recitation of case-specific facts for their truth when those facts do not fall under a statutory hearsay exception and/or are testimonial. (*Id.* at pp. 685–686.) Here, mother's statements were both nontestimonial and properly admitted under the hearsay exception for admissions. We decline to consider Wilson's undeveloped argument—made for the first time in his reply brief— that Dr. Gilgoff's expert testimony recited and relied on certain other alleged case-specific hearsay in violation of *Sanchez*. (*Vera v. REL-BC, LLC* (2021) 66 Cal.App.5th 57, 65, fn.2.)

and through the morning of November 21, including Wilson's statements to paramedic Shair-Ali, child welfare social worker Manuel, Officer Jones, and Detectives Kenney and Mustard, as well as the testimony of mother's sister, K.D., and Wilson's sisters, T.W. and M.J. Mother conveyed to child welfare social worker Montano that she had not seen any burn marks on A.Y. and that Wilson was generally responsible for bathing the children because she worked. Mother told Dr. Gilgoff that A.Y. had not complained of stomach or head pain during the relevant timeframe.[12] And, finally, mother stated to hospital social worker Harris that she did not know how A.Y. was injured.

In fact, the only statement for which we have been unable to find corroboration in the record is mother's statement to the police that there had been no visitors to the house on November 20, the evening before A.Y.'s hospitalization. However, mother had stated that there were no visitors "that she knew of," substantial evidence was presented that A.Y. had been healthy and active through the morning of November 21, and there was ample evidence that various family members saw and/or cared for A.Y. in the

---

[12]In addition, Dr. Gilgoff testified mother told her specifically that A.Y. did not complain of the "worst headache of his entire life," vomit, or show motor or verbal impairment in the days leading up to his November 21 hospitalization, all signs the doctor would expect from the type of head injuries A.Y. suffered. At oral argument, Wilson stressed that the admission of these particular statements through Dr. Gilgoff was highly prejudicial because of their specificity and relevance to dating the head injury. However, we have already found the statements admissible under both *Aranda/Bruton* and *Crawford*. Moreover, we do not find these statements materially different from the more general statements made by multiple sources, including Wilson, that A.Y. was behaving normally in the days leading up to the November 21 hospitalization, other than being somewhat whinier and clingier. Put another way, that a child is acting normally is the functional equivalent of stating that the child is not displaying any of these obvious and severe symptoms.

week prior to his hospitalization.  Thus, this single statement is hardly material.  Rather, it is " ' "clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the [*Crawford*] error" ' " in this case.  (See *Bryant*, *supra*, 60 Cal.4th at p. 395.)

## C.     *Admission of Uncharged Domestic Violence*

Wilson assigns several claims of error with respect to the trial court's admission of evidence regarding his uncharged 2013 incident of domestic violence with a prior girlfriend.  He argues that admission of the domestic violence evidence pursuant to Evidence Code section 1109 was improper because it had nothing to do with the current allegations of child abuse and was therefore irrelevant.  He further contends that the trial court failed to balance the probative value of the evidence against its prejudicial impact as expressly required by Evidence Code sections 1109 and 352, and that, even if the court implicitly did so, its balancing test should have resulted in the exclusion of the evidence.  And he claims that the court erroneously instructed the jury both on the use of such propensity evidence and on the specifics of his uncharged offense, thereby violating his constitutional rights to due process.  We address each argument in turn.

### 1.     *Legal Framework*

Only relevant evidence is admissible at trial.  (Evid. Code, § 350.) Evidence Code section 210 defines relevant evidence as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  Pursuant to Evidence Code section 352, however, a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of

40

misleading the jury." Thus, under Evidence Code section 352, a trial court has "broad discretion . . . to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects." (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*); Evid. Code, § 352.) Importantly, prejudice in this context " 'is not synonymous with "damaging," but refers instead to evidence that " 'uniquely tends to evoke an emotional bias against [a] defendant' " without regard to its relevance on material issues. [Citations.]' " (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 35 (*Zepeda*).)

Pursuant to Evidence Code section 1109, subdivision (a), "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." Evidence Code section 1109 thus provides an exception to the general rule that "character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159 (*Villatoro*) [discussing Evid. Code, § 1108].)[13] However, as the statutory language makes clear, trial judges "must engage in a careful weighing

---

[13] Evidence Code section 1109 involving other domestic violence offenses and Evidence Code section 1108 involving other acts of sexual abuse have been described as "virtually identical." (*People v. Johnson* (2000) 77 Cal.App.4th 410, 417 (*Johnson*).) Thus, case law with respect to one of the statutes is often applied to the other statute "by parity of reasoning." (See, e.g., *ibid.*; see also *Villatoro*, *supra*, 54 Cal.4th at p. 1162, fn. 4; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1333 ["[Evidence Code] sections 1108 and 1109 can properly be read together as complementary portions of the same statutory scheme"].)

41

process under [Evidence Code] section 352" before admitting other incidents involving domestic violence under Evidence Code section 1109. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*) [discussing Evid. Code, § 1108].)

The reasoning behind the creation of the domestic violence exception was described in the legislative history for Evidence Code section 1109 as follows: " 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked.' " (*Johnson, supra,* 77 Cal.App.4th at p. 419; see also *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1313 (*Jennings*) [reasoning that, like sex crimes, "domestic violence is quintessentially a secretive offense, shrouded in private shame, embarrassment and ambivalence on the part of the victim, as well as intimacy with and intimidation by the perpetrator"].)[14]

The factors to be considered by a trial court in conducting the Evidence Code section 352 weighing process mandated by Evidence Code section 1109 depend upon "the unique facts and issues of each case." (*Jennings, supra,* 81 Cal.App.4th at p. 1314.) Rather than admit or exclude every prior offense

---

[14] Legislative findings with respect to Evidence Code section 1108 note the critical need for propensity evidence in sex offense cases given the " 'serious and secretive nature of sex crimes' " that often results in a " 'credibility contest at trial' " as well as the " 'particularly probative' " nature of such evidence because " 'the willingness to commit a sexual offense is not common to most individuals.' " (*Falsetta, supra,* 21 Cal.4th at pp. 911–912.)

involving domestic violence, "trial judges must consider such factors as [the incident's] nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other . . . offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, 21 Cal.4th at p. 917 [discussing Evid. Code, § 1108].)

We review a trial court's rulings under Evidence Code section 352 for abuse of discretion. (*People v. Coneal* (2019) 41 Cal.App.5th 951, 964 (*Coneal*); *People v. Minifie* (1996) 13 Cal.4th 1055, 1070 (*Minifie*).) A trial court's conclusions with respect to relevancy are likewise discretionary and reviewable only for abuse. (*People v. Jablonski* (2006) 37 Cal.4th 774, 821.) In other words, reversal is appropriate only when these evidentiary decisions " 'fall[] outside the bounds of reason.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1149 (*Carter*).)

In contrast, any issue of statutory or constitutional interpretation, as well as our review of alleged instructional error, is de novo. (*Tirado, supra*, 12 Cal.5th at p. 694; *Valley Baptist Church v. City of San Rafael* (2021) 61 Cal.App.5th 401, 410; *People v. Cole* (2004) 33 Cal.4th 1158, 1210.) However, "[t]he admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*Falsetta, supra*, 21 Cal.4th at p. 913.) And, when considering alleged instructional error, a challenged instruction "is considered 'in the context of the instructions as a whole and the trial record to determine

whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326 (*Rivera*).)

### 2. *No Error in Admission of Prior Domestic Violence*

Prior to trial, the prosecutor moved under Evidence Code section 1109 to admit Wilson's July 2013 conviction for an incident of domestic violence against a former girlfriend (§ 243, subd. (e)(1)). After briefing and a number of discussions regarding the issue, the trial court allowed the evidence over defense counsel's objection. At trial, the prosecutor introduced the information by playing a portion of Wilson's police interview in which he admitted the altercation and stated he was required to attend domestic violence classes.[15] Defense counsel's renewed objection was denied.

We first reject Wilson's contention that the evidence regarding his past domestic abuse bore no similarity to the instant child abuse allegations and therefore should have been excluded as irrelevant. "Relevance is a low bar." (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1052.) As stated above, evidence need only have "any tendency in reason to prove or disprove" a consequential disputed fact to be relevant. (Evid. Code, § 210.) Under appropriate circumstances, a prior incident of domestic partner abuse could reasonably be

---

[15] Specifically, in response to questioning regarding whether he had any history of violence in his past relationships, Wilson stated: "I smack my parent to the ground like one, now [I'm] going to do my 52 classes right now, but they—because domestic violence." The incident happened in Alameda County, but he was allowed to take the classes where he lived. We assume Wilson was referring to a co-parent, as he confirmed that all of his ex-girlfriends had children and the conviction was discussed in terms of violence against a former girlfriend. The trial court informed the jurors that they were hearing "reference to a possible prior conviction of a crime by [Wilson]" which could only be used for a specific, limited purpose as it would later instruct them.

44

viewed as " 'part of a larger scheme of dominance and control' " in domestic relationships, making it relevant to current charges of domestic child abuse. (*Johnson*, *supra*, 77 Cal.App.4th at p. 419.)

In fact, this assumption is incorporated into Evidence Code section 1109's definition of domestic violence. Pursuant to that statute, domestic violence has the meaning set forth in section 13700 and Family Code section 6211. (Evid. Code, § 1109, subd. (d)(3).) While section 13700 is limited to abuse between intimate partners, Family Code section 6211 defines domestic violence more broadly to include violence perpetrated against a "cohabitant or former cohabitant, as defined in [Family Code] Section 6209." (Fam. Code, § 6211, subd. (b).) Family Code Section 6209, in turn, states that " '[c]ohabitant' means a person who regularly resides in the household." Thus, in enacting Evidence Code section 1109, the Legislature contemplated that child abuse could also be domestic abuse where, as here, the child and the perpetrator regularly lived together. (See *People v. Dallas* (2008) 165 Cal.App.4th 940, 956 (*Dallas*) [quoting an Assembly analysis of Evidence Code section 1109 which stated: The " 'broader definition' " of domestic violence in Family Code section 6211 " 'will have two effects. First, and most important, *prosecutors will be able to use propensity evidence in the prosecution of child abuse cases.* . . . Second, in any domestic violence case, the prosecutor will be able to bring in relevant evidence of prior violence against children.' "].)

Pursuant to Evidence Code section 1109, additional safeguards must be in place before child abuse can be equated to domestic violence for purposes of a propensity finding. The statute states: " 'Domestic violence' has the meaning set forth in [section 13700]. Subject to a hearing conducted pursuant to [Evidence Code] Section 352, which shall include consideration of

45

any corroboration and remoteness in time, 'domestic violence' has the further meaning as set forth in Section 6211 of the Family Code, if the act occurred no more than five years before the charged offense." (Evid. Code, § 1109, subd. (d)(3).)

Here, the uncharged domestic violence incident took place in 2013 and the charged acts of child abuse occurred in November 2014. Under these circumstances, we conclude evidence of Wilson's prior incident of domestic abuse involving a former girlfriend is sufficiently probative of his propensity to commit domestic abuse to be deemed relevant in this child abuse/domestic violence case. (Compare *Falsetta*, *supra*, 21 Cal.4th at p. 915 [noting in the context of Evidence Code section 1108 that "case law clearly shows that evidence that [a defendant] committed other sex offenses is at least circumstantially *relevant* to the issue of [the defendant's] disposition or propensity to commit these offenses"].) The Fourth District has concluded as much under a similar analysis. (See *Dallas*, *supra*, 165 Cal.App.4th at pp. 951–956 [finding evidence of domestic violence by the defendant against a former girlfriend relevant and admissible under Evidence Code section 1109 in a child abuse case involving an infant who regularly resided in the defendant's household].) We thus turn to the admissibility of the evidence under Evidence Code section 352.

Preliminarily, we disagree with Wilson that the trial court in this case failed to balance the probative value of his prior domestic violence incident against its prejudicial impact. As the Supreme Court has repeatedly reaffirmed, " 'when ruling on [an Evidence Code] section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state that it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under

46

. . . [Evidence Code] section 352.' " (*Jennings*, *supra*, 81 Cal.App.4th at p. 1315 [citing cases and concluding that nothing in *Falsetta* overturned this longstanding rule].)  Record indications "well short of an express statement" are sufficient.  (*People v. Padilla* (1995) 11 Cal.4th 891, 924 (*Padilla*) disapproved on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 822–823, fn. 1.)

In this case, the parties both filed briefs in the trial court arguing about whether the evidence passed muster under Evidence Code section 352.  In addition, the trial court asked the parties to brief whether the evidence was "otherwise prejudicial in some sort of way."  Thereafter, the prosecutor cited the *Dallas* case to the trial court, which includes several discussions of the need to conduct an Evidence Code section 352 analysis when the broader definition of domestic violence is relied upon to admit propensity evidence.  (*Dallas*, *supra*, 165 Cal.App.4th at pp. 949, 952–953, 955.)  And the trial court indicated that *Dallas* addressed its "main question."  We thus conclude that the trial court understood and fulfilled its responsibilities under Evidence Code section 352. (Compare *Villatoro*, *supra*, 54 Cal.4th at p. 1168 [finding trial court implicitly conducted an Evidence Code section 352 analysis given court's reliance on a key case in the area and the reference to Evidence Code section 352 in Evidence Code section 1108]; *Padilla*, *supra*, 11 Cal.4th at p. 924 [implicit weighing can be based on arguments of counsel and statements of trial court].)

We additionally conclude that the trial court did not abuse its discretion in admitting evidence of the prior domestic violence incident pursuant to Evidence Code section 352.  We have already found the uncharged domestic violence relevant and noted that it occurred close in time to the instant charges.  The degree of certainty that the uncharged incident

actually occurred was quite high as Wilson admitted that he "smacked" his former girlfriend to the ground and was required to attend domestic violence classes as a result. And, since Wilson admitted the uncharged offense, he bore no burden defending himself against it. Nor was it likely that the brief mention of this prior domestic violence incident would confuse, mislead, or distract the jurors from their main inquiry. The single incident was also much less inflammatory than the charged offenses and thus unlikely to have an unduly prejudicial impact by evoking an emotional bias against Wilson. (See *Falsetta, supra*, 21 Cal.4th at p. 917 [listing factors to be considered in an Evid. Code, § 352 analysis under Evid. Code, § 1108].) That evidence may be damaging to a defendant's case does not make it prejudicial. (*Zepeda, supra*, 167 Cal.App.4th at p. 35.)

Wilson's argument thus rests on the single remaining *Falsetta* factor— that the uncharged domestic violence is insufficiently similar to be admissible under Evidence Code section 352. He argues that the domestic violence incident against his former girlfriend involved an adult; there was no evidence of repetition, actual injury, or use of a lighter; and it was not even clear that the abuse took place in the family home. While we agree with Wilson that the uncharged offense evidence " 'must have some tendency in reason to show that the defendant is predisposed to engage in conduct *of the type charged*' " (*People v. Jandres* (2014) 226 Cal.App.4th 340, 355), we find Wilson's list of variations composed of distinctions rather than material differences. Wilson knocked his domestic partner to the ground in 2013. In 2014, he was charged with multiple injuries to a young and vulnerable member of his household, including several which would have required the infliction of blunt force to the child's head or abdomen. In short, the prior incident of domestic violence could reasonably be viewed as " 'part of a larger

scheme of dominance and control' " in Wilson's domestic relationships. (*Johnson, supra,* 77 Cal.App.4th at p. 419.) It was certainly not outside the bounds of reason for the trial court to conclude on these facts that the probative value of the evidence was not substantially outweighed by the "probability" its admission would "create substantial danger of undue prejudice." (Evid. Code, § 352.) In short, we see no error in the admission of the evidence.

### 3. *No Instructional Error*

With respect to Wilson's prior incident of domestic violence, the trial court in this case instructed the jury using a modified version of CALCRIM No. 852. Thus, after describing the elements of domestic violence and the prosecution's burden of proof with respect to the uncharged crime, the instruction continued: "If you decide the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit the acts of child abuse charged here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charged in counts 1–5. The People must still prove the charge beyond a reasonable doubt."

Relying on *People v. James* (2000) 81 Cal.App.4th 1343, Wilson asserts that use of this instruction violated his state and federal constitutional rights to due process. He contends the instruction is improper because it makes the link between the prior incident and the pending charges "exceedingly powerful" in a way not required by Evidence Code section 1109. Specifically,

it permits the jury to infer from the evidence of uncharged domestic violence " 'that the defendant was likely to commit and did commit' " the charged acts of child abuse. In *James*, the appellate court concluded that the instruction violated due process based on this instructional language, stating: "A permissive inference can permit too much. Telling the jury that prior offenses may support an inference of guilt invites the jury to misuse prior offense evidence. [Evidence Code] section 1109 makes no mention of inferring guilt from propensity." (*Id*. at pp. 1346, 1357 & fn. 8.) The appellate court reasoned that "[e]ven when the trial court has screened the evidence under [Evidence Code] section 352, there is still a danger that the presumption of innocence will melt under the heat of emotions aroused by the defendant's prior offenses." (*Id*. at p. 1353.) This argument, however, has since been foreclosed by the Supreme Court.

In *Falsetta, supra*, 21 Cal.4th 903, our high court held that due process is not offended when the trial court determines that the probative value of propensity evidence outweighs its prejudicial effect, and properly instructs the jury on the presumption of innocence and the prosecution's burden of proof. (*Id*. at pp. 916, 919–920 [concluding that Evid. Code, § 352 "provides a safeguard that strongly supports the constitutionality of [Evidence Code] section 1108," and thus, by parity of reasoning, Evid. Code, § 1109].) Then, in *People v. Reliford* (2003) 29 Cal.4th 1007, the Supreme Court specifically upheld the instructional language challenged by Wilson. The Court opined: "The first part of the instruction permits jurors to infer the defendant has a disposition to commit sex crimes from evidence the defendant has committed other sex offenses. The inference is a reasonable one. As we stated in *Falsetta*, 'evidence that [the defendant] committed other sex offenses is at least circumstantially *relevant* to the issue of his disposition or propensity to

50

commit these offenses.' " (*Reliford*, at p. 1012.)  The Court stressed, however, that trial courts must "engage in a careful weighing process under Evidence Code section 352.  Thus, when the evidence is admissible, it may support an inference—as the instruction provides—that the defendant is predisposed to commit sex offenses."  (*Id.* at p. 1013.)  "The instruction next informs the jurors they may—but are not required to—infer from this predisposition that the defendant was likely to commit and did commit the charged offense."  (*Ibid.*)  The *Reliford* Court concluded that this was also "a legitimate inference.  A jury may use 'the evidence of prior sex crimes to find that defendant had a propensity to commit such crimes, which in turn may show that he committed the charged offenses.' "  (*Ibid.*)

Wilson attempts to avoid the holding in *Reliford* by pointing to a footnote in the case which states:  "We are not presented with, and do not decide, whether the uncharged sex acts must be similar to the charged offenses in order to support the inference."  (*Reliford, supra*, 29 Cal.4th at p. 1012, fn. 1.)  He argues that *Reliford* is not controlling on the constitutional issue given the dissimilarities of the charged and uncharged offenses in this case.  But we have already concluded that the offenses here are more similar than Wilson admits.  Moreover, as stated above, after noting that it was not presented with dissimilar offenses, the *Reliford* Court stressed that, prior to the admission of propensity evidence, a trial court "must . . . engage in a careful weighing process under Evidence Code section 352."  (*Id.* at pp. 1012–1013 & fn.1.)  The Court concluded:  "Thus, *when the evidence is admissible, it may support an inference—as the instruction provides—*that the defendant is predisposed to commit sex offenses.  (*Id.* at p. 1013, italics added.)  Having upheld the admission of the prior domestic abuse under Evidence Code section 352, we find *Reilford* controlling and reject Wilson's claimed error.

51

Wilson's related allegation—that the instruction was erroneous as a matter of law because it informed the jurors that he had committed a much more serious offense than the simple battery of which he was convicted—is easily dismissed. The court instructed the jury that the prosecution had presented evidence that Wilson "committed domestic violence that was not charged in this case, *specifically: it is alleged* that [Wilson] committed a violation of Penal Code section 243(e)(1), assault on a person with whom [he] had a dating relations[hip] in April 2013." (Italics added.) The instruction then described domestic violence as "abuse committed against a person with whom the person had a dating relationship." And "abuse" was defined as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else." Finally, as discussed above, the jury was informed it could only consider this evidence if *it* concluded by a preponderance of the evidence that Wilson had committed an uncharged act of domestic violence.

In other words, according to the instruction, while the prosecution *alleged* that Wilson had committed uncharged domestic violence, it was up to the jury to decide whether the underlying facts of the offense against Wilson's former girlfriend presented by the prosecution were sufficient to constitute "abuse" and therefore domestic violence. The instruction does not equate a conviction under section 243, subdivision (e)(1) with domestic violence. Under such circumstances, we see no " 'reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Rivera, supra,* 7 Cal.5th at p. 326.)

### D. Limitation of Evidence Regarding Mother's Behaviors

Wilson next claims that the trial court erred in excluding relevant testimony of certain witnesses he intended to call to undermine mother's credibility. The excluded testimony falls generally within three categories: (1) evidence mother discouraged A.Y. from complaining about any injuries; (2) evidence mother was an inattentive parent to A.Y.; and (3) evidence mother was afraid of child welfare becoming involved with her children because of her own involvement with the agency as a child. According to Wilson, the trial court's decisions were erroneous under state law and also violated his constitutional confrontation rights, as well as his constitutional rights to due process and to present a defense. However, the evidentiary rulings Wilson contests fell well within the trial court's discretion and fail to support any related constitutional challenge.

#### 1. Additional Background

Mother moved in limine to preclude Wilson from presenting evidence of her alleged bad character and poor parenting of A.Y. The trial court discussed the admissibility of such evidence several times, beginning during the initial discussion of motions in limine on February 11. Although Wilson never clearly delineates each statement from each potential witness the court erred in excluding, we will summarize the most relevant proffered testimony under each of the above-referenced categories.

With respect to R.N., the guardian of A.Y.'s half-brother Anthony, Wilson's defense counsel stated he could testify that mother was "threatening and aggressive in her demeanor" and that Anthony was afraid of returning to mother's care. The court responded that the suggested testimony felt like gossip and was hearsay from a young child. Mother's attorney objected that the evidence was irrelevant, prejudicial, and also would "open[] up this entire

can of worms with the dependency case." The court agreed. It did not see the testimony as admissible.

In a similar vein, M.S., A.Y.'s adoptive mother, could reportedly testify that she saw mother fail to respond after A.Y. was knocked to the ground by another child in May 2015. Schwartz argued this was testimony of a percipient witness regarding mother's parenting style, showing a "pattern of nonresponsiveness." Mother's attorney asserted it was impermissible character evidence. The court, however, was having trouble finding the relevance in M.S.'s observations eight months after the charged offenses and did not think it was admissible on that basis. The court later reiterated that M.S. would not testify unless there was something really specific which it hadn't yet heard because it would open up questioning regarding her motivations and biases as a potential adoptive parent.

Wilson's mother, F.W., was reportedly able to testify that A.Y. was very active and would often hurt himself and that, when A.Y. got hurt, mother would tell him to " '[s]hake it off,' " tell him not to cry, and would not check on the boy to see if he was "actually injured." Schwartz argued that mother's "parenting style [was] extremely relevant" because she was "a parent who just watches [an injury] happen and doesn't do anything to protect, doesn't pick the child up and see how they are injured" and thus "we might have an injury that caused a preexisting injury to exacerbate over time." The trial court characterized as gossip and "possibly racist nonsense" generalized testimony that mother didn't protect the way a particular witness thought she should. However, it found admissible evidence that A.Y. was injured and mother did not do anything so long as it occurred in between A.Y.'s scrotum injury in early November 2014 and his November 21 hospitalization for the injuries at issue in the case.

54

The court continued in this vein when considering the possible testimony of Wilson's sisters, T.W. and M.J. For instance, the court indicated that testimony from M.J. that mother would go clubbing and leave the children with various family members would not be admissible. However, it tentatively believed M.J.'s potential testimony that mother did not want to take A.Y. to the hospital for his testicular injury due to fear of possible child welfare involvement would be admissible. The court pointed out that the groin injury "is the kind of specific evidence that maybe it does say something." Several days later it concluded that both the testicular injury and mother's reluctance to take A.Y. to the hospital were admissible.

Considering T.W.'s possible testimony—that she saw a lamp fall on Anthony, heard mother tell him to " '[s]top all the fucking crying,' " and it was T.W. who picked up Anthony and cleaned his wounds, including burns—the court concluded "if it is anywhere remotely in time near these events and with specificity, you can get an express like refusal to treat in the face of a burn, maybe that's relevant. Later, the court learned that Anthony had been burned by the lamp's light bulb approximately a year before the current incident, although the exact timing was unclear. The court excluded the testimony as vague and irrelevant based on its remoteness in time.

When the prosecutor described for the court certain testimony she intended to elicit from various child welfare workers, including statements made to them by mother and Wilson, mother's perceived protective attitude towards Wilson, authentication of certain pictures of A.Y., and mother's perceived failure to appreciate the scope of A.Y.'s injuries, the court opined that statements of the defendants would for the most part be admissible, while subjective opinions about a person's state of mind would not be. For instance, the court excluded a March 2015 statement mother made to a social

worker about the scope of A.Y.'s injuries when she was upset about A.Y.'s placement as vague and prejudicial.

On February 13, 2019, when mother's counsel stated her understanding of the trial court's evidentiary rulings—that "allegations of generalized bad parenting opinion . . . [were] not coming in but perhaps some specific acts of failing to respond to things close in time to the alleged incident might"— the court responded counsel's description was "exactly right" and noted it felt the same way regarding the child welfare witnesses. Schwartz objected, arguing he should be able to show a "prevailing pattern" of mother failing to respond appropriately to an injury even outside the timeframe adopted by the court. The court responded it would have that discussion if Schwartz could point to a specific event.

On February 18, Wilson filed supplemental motions in limine stating, among other things, that his right to present a defense included the right to elicit evidence that mother was afraid to seek care for A.Y. at a medical facility due to both her own experience as a minor with child welfare and her concern that A.Y.'s bruises and marking might catch the attention of the authorities. Later, after social worker Montalvo testified, Schwartz objected to the trial court's refusal to allow cross-examination that mother had told Montalvo "that she had been in six foster homes and she had been abused, to show a motive for her desire to not report injuries of [A.Y.] out of concern he might get involved with the authorities and might have a similar experience that she had." Schwartz also objected because he was not able to elicit testimony that mother told Montalvo "that she had moved out of the home with [Wilson] because the authorities were pushing her to blame him." The court responded that any evidence of mother's own child welfare history was unduly prejudicial under Evidence Code section 352 and "not probative." As

56

for the other disallowed evidence, the court encouraged Wilson to "have at it" with the police but concluded it was double hearsay with respect to mother's statement.

Finally, after conducting Evidence Code section 402 hearings for M.J. and T.W., the court concluded that M.J.'s evidence regarding the testicular injury was admissible, including evidence regarding mother's reluctance to receive treatment. Evidence regarding a knot on A.Y.'s head after a visit with his father was excluded because it happened before the testicular injury. Evidence T.W. saw A.Y. being clingy and whiny with mother the week before the November 21 hospitalization was admissible. As was evidence that around November 2014, M.J. discovered her six-year-old son setting a tissue on fire in the bathroom with a disposable lighter. They put out the fire with water, after which M.J. educated him regarding the dangers of fire, including showing him pictures of children who had been burned. After that, there were no further incidents.

T.W. testified in the 402 hearing that she saw A.Y. every day and that he was very clingy and whiny the week before his November 21 hospitalization. She saw A.Y. fall and bump his head in the week before November 21. Generally, he fell about three times a day during that week. Mother also told her during the testicular injury that she was a foster child and did not want them to think she was doing anything to her son because he had scars on him. In the month before the testicular injury through November, she heard mother tell A.Y. to shut up if he cried "a lot." Mother would swat A.Y. in the chest using the back of her hand. The court held that the testimony regarding mother's reluctance to report the testicular injury due to a fear of foster care was admissible but "[w]e're not going any farther on any issue of foster care." It found that mother's discipline practices as

evidence regarding why A.Y. might not respond to "huge injuries" vague and unduly prejudicial. However, T.W. could testify as to the falling down that she observed. Wilson was also allowed to offer testimony from another relative, K.J., that A.Y. hit is head on a coffee table and a heater vent in November 2014.

### 2. *Legal Framework*

As set forth above, pursuant to Evidence Code section 352, a "court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Merriman, supra*, 60 Cal.4th at p. 74; Evid. Code, § 352.) In particular, " '[t]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 301.) We review a trial court's rulings excluding impeachment evidence under Evidence Code section 352 for abuse of that broad discretion. (*Coneal, supra*, 41 Cal.App.5th at p. 964; *Minifie, supra*, 13 Cal.4th at p. 1070.)

Regarding constitutional limitations, our high court has held that " ' "not every restriction on a defendant's desired method of cross-examination is a constitutional violation." ' " (*People v. Lewis* (2001) 26 Cal.4th 334, 375; see also *People v. Thornton* (2007) 41 Cal.4th 391, 443 ["Ordinarily a criminal defendant's attempt 'to inflate garden-variety evidentiary questions into constitutional ones [will prove] unpersuasive.' "].) " ' "Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of

marginal relevance." ' " (*Lewis*, at p. 375.) "Unless the defendant can show that the prohibited cross-examination would have created a significantly different impression of the witness's credibility, the trial court's exercise of discretion to restrict cross-examination does not violate the constitutional right of confrontation." (*People v. Sanchez* (2016) 63 Cal.4th 411, 451.) Similarly, " '[a]s a general matter, the "[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to present a defense." [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.' " (*Thornton*, at p. 443.)

3. **The Evidentiary Decisions Fell Within the Trial Court's Discretion**

Preliminarily, we express some confusion regarding Wilson's argument as to his need to undercut mother's credibility in this case. Wilson points to the same statements from mother that we considered above in his Sixth Amendment challenge—essentially that Wilson was A.Y.'s primary caregiver, that the child was showing no signs of significant distress prior to his November 21 hospitalization, and that mother saw no burns or other unusual injuries on him prior to that date—claiming a need to undercut their veracity. He argues repeatedly that his and mother's defenses were diametrically opposed. But as we discussed above in rejecting the need for severance, the two defenses were not mutually exclusive. Rather, mother argued that she did not see anything and knew nothing, while Wilson argued that others committed any abuse and A.Y. was otherwise suffering from viral encephalitis. As we have noted, mother's statements largely confirmed Wilson's own admissions and could be viewed as supporting his claim of

59

infectious disease. While mother did state she saw none of the smiley face burns prior to November 21, she explained that she did not generally bathe A.Y. and had only been wiping him down for a period after his testicular surgery.

Nevertheless, Wilson argues the excluded evidence was crucial in three ways. First, evidence that mother was inattentive when A.Y. injured himself would support the conclusion that she would not have noticed the BIC lighter burns or other injuries. Second, evidence that mother told A.Y. to be tough and not to cry would help establish that A.Y. might hide pain or mother would ignore reports of pain. Third, mother's own experience in foster care and her fear of losing her children would provide a strong motive for failing to report A.Y.'s injuries. We will consider Wilson's evidentiary claims against this backdrop.

With respect to the testimony of Anthony's guardian, the trial court properly excluded any reference to what Anthony may have said to him about mother as hearsay. As for the guardian's statement that he observed mother as "threatening and aggressive," we see no abuse of discretion in its exclusion under Evidence Code section 352. The observation was marginally relevant, if at all, given that it took place at a time after mother's children had been removed from her care. And the testimony of the guardian would have informed the jury about Anthony's removal from mother, which would likely have led to a discussion of a multitude of ancillary issues of little relevance and possible prejudice. For instance, as noted in the trial court, cross-examination exposing the guardian's possible bias as a prospective permanent placement for Anthony could well be appropriate once the child welfare "can of worms" was opened. For similar reasons, we see no error in the exclusion of the testimony of A.Y.'s adoptive mother that she saw mother

fail to respond after A.Y. was knocked to the ground by another child in May 2015. Having taken place after A.Y. was removed from mother, this incident was not necessarily relevant to mother's parenting practices in the timeframe prior to A.Y.'s November 21, 2014 hospitalization and would create the same problems of opening up the ancillary issue of the child welfare proceedings.

Turning to the exclusion of evidence regarding mother's own experiences in foster care as a child, we note that the trial court allowed Wilson's sisters to testify that mother was reluctant to take A.Y. to the hospital because of the bumps and bruises on his body and her fear they might think she was abusing him. This evidence tended to show mother would be unlikely to report A.Y.'s injuries. Testimony regarding mother's own child welfare experiences would have been cumulative of this testimony, would have raised an otherwise irrelevant ancillary issue at trial, and was unlikely to have had any significant impact on Wilson's defense. Although Wilson argues the evidence was necessary to show the jury "the depth of [mother's] fear, and thus her motive to lie/exaggerate," we see no abuse of discretion in the exclusion of the evidence under Evidence Code section 352. (Compare *People v. Allen* (1986) 42 Cal.3d 1222, 1268–1269 [rejecting argument "the jury could not fully appreciate the depth of [the witness's] desire for protective custody and, therefore, the depth of his motivation to testify against defendant, without understanding the *reason* [the witness's] life had been threatened—i.e., because he had murdered a small child"; the witness's fear and pressing desire for protective custody were "clearly relevant" but it was hard to see why the underlying reason for the fear was relevant].)

Finally, with respect to proposed testimony from Wilson's mother and sisters that mother ignored A.Y.'s injuries and often told him to be tough and

shake off injuries, the court concluded it would only admit evidence of mother's inattentiveness if it occurred in the period between A.Y.'s hospitalization for his testicular injury on November 8 and his November 21 hospitalization. The court found testimony that mother often told A.Y. to be tough and shake off injuries vague and unduly prejudicial. And it questioned its tendency to prove that A.Y. might not respond to the pain caused by the "huge injuries" at issue in this case. We see no abuse of discretion in either of these evidentiary decisions.

When A.Y. was hospitalized on November 9, the doctor who examined him saw no burn marks or lacerations on him and found him generally healthy except for the scrotum issue. Thus, if mother had been inattentive between that hospitalization and the second one, that fact could be relevant to the argument that an injury occurred during that timeframe and became exacerbated due to mother's inattentiveness. However, the trial court acted within its discretion in concluding that general inattentiveness before this timeframe was less relevant and had the potential for undue prejudice. Moreover, it was cumulative of mother's own admissions that she wasn't around and didn't see anything. As for the proposed testimony regarding mother's tough love parenting, we agree that it was prejudicial and its relevance to A.Y.'s response to the type of pain at issue here with respect to the burn and skull injuries was tenuous. It was also cumulative of Dr. Gilgoff's testimony that two-year-olds respond to pain in different ways and might not express it as much when afraid. In sum, we see no reason to disturb any of the trial court's challenged evidentiary rulings in this difficult case. And, because the excluded evidence would not have created a

significantly different impression of mother's credibility and did not preclude Wilson's presentation of his defense, we find no constitutional error.[16]

## E. *Allegations of Juror Misconduct*

Wilson next points to two incidents of alleged juror misconduct which he claims the trial court failed to investigate adequately. According to Wilson, the trial court's errors in this regard violated his rights to due process and a fair trial, requiring this court to grant him a new trial. We are not persuaded.

### 1. *Additional Background*

#### i. *First Incident with Second Alternate Juror*

After a prospective juror was seated as the second alternate juror (AJ2) in this case, another prospective juror informed the court that, when she and AJ2 were walking with a group to the parking lot the day before, AJ2 stated to her: " 'This man is guilty and the prosecution should throw the book at him.' " The prospective juror did not mention it earlier because she did not think either one of them would be called. But once AJ2 was seated, she became concerned. On the next court day, prior to opening statements, the court brought AJ2 into the courtroom and asked her if she had made any statement to another prospective juror to the effect that "the male defendant[] was obviously guilty." AJ2 repeatedly denied making such a statement. After AJ2 left, Schwartz, Wilson's defense counsel, asked that the other jurors be polled to see if any of them had heard the comment and that the prospective juror be brought back for further discussion. The trial court stated it was willing to release AJ2 at defense counsel's request, but

---

[16] Because we have concluded that the trial court did not abuse its discretion in excluding the challenged evidence under Evidence Code section 352, we need not address Wilson's claim that the evidence at issue was not impermissible character evidence.

Schwartz asked for further inquiry first. The trial court was concerned that an individualized inquiry would heighten the risk of prejudice but agreed to question the panel all at once.

After calling the jury in and repeating its previous admonishment that "people are not supposed to speak with each other about any facts of the case or render opinions about the case until you're back in the jury room," the court asked the jurors: "Any of you seen anything or heard anything that has you worried that maybe someone else was not following that admonition? None of you have seen or heard any other jurors saying or doing anything that you think is inconsistent with what I just said? You're all okay? Good."

Out of the jury's presence, the court then asked Schwartz if he thought AJ2 was incapable of giving Wilson a fair trial. Schwartz wanted to talk to the prospective juror who reported the comment again before "making th[e] call" whether to excuse AJ2. The court indicated that it believed they had gone through the appropriate process for an allegation of juror misconduct and that it was likely unresolvable given the two contradictory statements. It agreed to release the contact information for the complaining prospective juror to Schwartz if he wanted to make any further inquiry. Schwartz expressed satisfaction with this resolution, and, later that day, the court provided the contact information to all counsel. Subsequently, Schwartz indicated that he contacted the prospective juror, and she reiterated her earlier statement but provided no additional information.

ii. *Later Incident with AJ2 and Juror No. 2*

After the conclusion of witness testimony on February 28, 2019, Schwartz informed the court that he had received information that two of Wilson's relatives had seen several jurors engaging in conversation with the last witness to testify, mother's sister K.D. Reportedly, video and still

photographs memorialized the contact. The court put one of the relatives under oath out of the presence of the jury. She reported that she was walking behind two jurors when she saw them speaking to the witness on the way to the parking lot. The court reviewed a still photograph and a video, commenting that the only sound on the video was the witness speaking, the video was taken from a distance of 30 to 50 yards away, and the court was unable to discern anywhere in the video where an actual conversation took place between the jurors and the witness. The relative admitted she did not hear the specifics of the alleged conversation. A second relative reportedly also had a video of the encounter, but counsel never brought it forward.

At Schwartz's request, the court secured the phone so that the evidence could be preserved. It admonished the relative regarding the inappropriateness of recording jurors, explaining that whatever her motives, her conduct suggested the possibility of juror intimidation. And it ordered her not to return to the courthouse for the next two weeks. The court then questioned K.D., who had been asked to return to the courthouse. She denied under oath that she had spoken with anyone other than her family members during the relevant timeframe. She noted that jurors were walking back to their cars at the same time, but she did not speak to or "stand still" next to any of them. The court informed the parties that it had inquired and there was no security footage of the incident.

On the next court day (March 4, 2019), the court noted that no party had presented any further evidence from the seized phone. It felt duty bound to do an inquiry of the jury but indicated its review of the video did not support the witness allegations. Schwartz asked that the jurors be individually polled and clarified that he was not asking that AJ2 be excused prior to that inquiry. The court spoke to the panel as a whole, asking them to

65

raise their hand if they had been approached by any testifying witness or other person attempting to discuss the case, had any incidental discussions with any witness, or had themselves approached someone to discuss any aspect of the case. The court additionally asked if all the jurors were "still okay being here."

Although no problems were expressed by any juror, Schwartz requested that the two jurors involved in the potential misconduct—AJ2 and Juror No. 2—be individually polled. Attorneys for the other two parties did not think further inquiry was appropriate, mother's counsel expressing fear that "further inquiry [was] likely to infect the [jury] and cause them to believe that something was happening that didn't happen." The court indicated it would not take any further action at that point but stated that the phone was available if Schwartz wanted to "prepare evidence that cause[d] [the court] to accept as something more than completely manufactured this allegation that the jurors acted improperly." The court characterized the allegations as somewhere between "hypervigilance" and "something more nefarious." It stated it would do further inquiry if the evidence required it, but it was concerned that the repeated inquiries of the jury were already sending a message to the jury that there was "something scary" there, which could "inure[] to the detriment of the defendants." The court found preliminarily that no misconduct had been established but gave Schwartz time to do a "deeper dive" before making a final ruling.

Later that day, an attorney representing the relative whose phone had been seized appeared and offered to take custody of the phone and release the picture and video to the court and the parties. At the end of the court day, Schwartz finally asked the court to excuse AJ2 based on both incidents of alleged misconduct and his concern that she might "further infect" the jury.

66

The court stated it was less concerned about AJ2 than the other juror because it seemed AJ2 would not get on the jury. It suggested they all review the emailed materials from the attorney and discuss it in the morning.

On March 5, 2019, the trial court reviewed the still photograph, stating it was "hard to interpret." The court noted that K.D. was off to the right of the two jurors and looking in their direction but there was no indication that either juror was "in any way engaging with her" and it was unclear whether K.D. was even looking at the jurors rather than two individuals in front of them. As for the video, K.D. was "nowhere in sight" and all that was visible was the two jurors, with one of them looking backwards.[17] The court stated that nothing it had been given suggested jury misconduct but might possibly suggest juror intimidation.

Nevertheless, Schwartz renewed his request to excuse AJ2 from the jury and expressed concerns about Juror No. 2's possible lack of honesty regarding the encounter. The court explained that it would have excused AJ2 at the beginning because it did not know why the prospective juror who made the first complaint against her would lie. However, the court also questioned the prospective juror's motivations and, given the likelihood AJ2 would not be on the jury and the court's concern that there were "forces out there attempting to undermine th[e] trial," it felt that excusing AJ2 might "exacerbate the problem." The court concluded it did not see excusing Juror No. 2 at that point but was unsure about AJ2 and would defer things pending receipt of the other video.

---

[17] The court expressed concern that this was not the same video they had initially viewed in court, but the prosecutor thought it was the same one.

67

After learning the next day that Schwartz had not obtained any further evidence, the court reiterated its ruling—it looked like it did not need to be worried about AJ2 and it did not "see any evidence of anything" with respect to Juror No. 2.  When Schwartz continued to express his concern about AJ2, again renewing his request that she be excused, the court indicated its "larger concern" at that point was juror intimidation by associates of Schwartz's client and that it did not understand why Schwartz kept bringing up the "sidewalk thing" having made "no efforts to prove what it [was]."  As for the first alleged misconduct by AJ2, the court stressed that, after the alleged conversation occurred, he admonished the jury not to share such views, and it had no evidence the admonishment was ineffective.  Under the circumstances, the court declined to take any further action to draw jurors' attention to the matter.

### 2.    *Legal Framework*

Pursuant to section 1089:  "If at any time . . . a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty . . . the court may order the juror to be discharged."  (See also *People v. Martinez* (2010) 47 Cal.4th 911, 941, quoting § 1089.)  When a court becomes aware of possible juror misconduct, it must " ' " ' "make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.' " ' [Citation.]  The nature of the court's inquiry may consist of a full hearing or informal questioning of the juror in the presence of counsel.  [Citation.]  'The specific procedures to follow in investigating an allegation of juror misconduct are generally a matter for the trial court's discretion.' " (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1170 (*Johnsen*); accord, *People v. Cowan* (2010) 50 Cal.4th 401, 505–506 (*Cowan*).)

However, " ' "not every incident involving a juror's conduct requires or warrants further investigation." ' " (*Cowan*, *supra*, 50 Cal.4th at p. 506.) Rather, " ' a hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*People v. Osband* (1996) 13 Cal.4th 622, 675–676.) Moreover, "there is no showing of prejudice" when a compromised "alternate [is] never seated." (*People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1015 (*Alvardo*).)

### 3. *No Abuse of Discretion on this Record*

This is another of Wilson's claims for which our detailed review of the record speaks for itself, making clear that no abuse of discretion occurred here. Indeed, as argued by the Attorney General, this record reflects a trial court which "more than adequately" inquired into both of the juror misconduct allegations at issue. Nevertheless, we will respond briefly to Wilson's specific complaints.

Since AJ2 did not deliberate with the jury, we consider the first allegation of misconduct only to the extent that it may have impacted the second allegation. (*Alvarado*, *supra*, 133 Cal.App.3d at p. 1015.) In response to the assertion by the prospective juror that AJ2 told her she thought Wilson was guilty and should be punished, the trial court spoke with both involved parties, polled the jury as a whole, admonished them not to talk about the facts of the case or render any opinions before the start of deliberations, and released the contact information for the complaining prospective juror to all parties for any further investigation. AJ2 repeatedly denied the misconduct and, as the court noted, the conflict between her statement and that of the prospective juror was likely unresolvable. The court initially offered to

69

excuse AJ2, but no party requested it. And no further information was ever presented to the court bearing on the claim.

Although Wilson argues that the court should have recalled the prospective juror to ask her if she could identify any other jurors who heard AJ2's comments, Schwartz interviewed her and did not report any further useful information to the court. A reasonable inference from this fact is that there was none. Wilson also asserts that the trial court should have conducted an individualized inquiry of the jurors with respect to any taint from the alleged misconduct. However, under these circumstances, no such individualized inquiry was necessary. (Compare *People v. Foster* (2010) 50 Cal.4th 1301, 1342 [no need for further inquiry where no evidence other jurors had overheard improper comments heard by one juror or had been involved in similar incidents]; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1175 [no duty for trial court to inquire as to whether *"other jurors"* were improperly impacted by an excused juror's anxiety in court and brief statement to two witnesses where "no indication in the record that other jurors may have been affected" by the misconduct].)

We are somewhat baffled by Wilson's complaints with respect to the second allegation of misconduct—that K.D. improperly spoke to two jurors after her testimony—given that the trial court repeatedly indicated the video and photograph at issue provided no credible evidence of misconduct.[18] Moreover, it is clear from the court's discussion of this issue that it was skeptical of the relative who reported and memorialized the alleged

---

[18] While the video itself was not preserved in the record, we have reviewed several photographs and/or still shots from the video provided to us by means of a settled statement. Given the detailed description of the materials by the trial court and our review of the proffered photographs, the record is sufficiently clear for our resolution of this misconduct issue.

70

misconduct, while it seemed to accept K.D.'s denial of any juror contact. (See *Johnsen*, *supra*, 10 Cal.5th at p. 1170 [no basis to second-guess the trial court's implicit credibility determination]; *People v. Pride* (1992) 3 Cal.4th 195, 259–260 [trial court permissibly credited juror's denial of defense allegation of misconduct].) Nothing more was required. (Compare *Cowan*, *supra*, 50 Cal.4th at pp. 504–508 [court acted within its discretion in declining to conduct further investigation when it possessed ambiguous evidence that a juror may have had contact with relative-witnesses; although the juror "probably should not have been sitting near defendant's relatives who also were witnesses, the trial court reasonably could have concluded that there were no grounds for believing that [the juror] had actually been engaged in a conversation with them"].)

## F. Substantial Evidence Supports the Torture Verdict & Child Abuse Enhancement

Wilson concedes there was sufficient evidence in this case from which the jury could conclude that he inflicted some of the burn injuries on A.Y. He contends, however, that there was insufficient evidence those lighter burns constituted great bodily injury, a finding necessary to support both his conviction for torture under count 1 and the great bodily injury enhancement with respect to the burn injuries under count 5 (§§ 206, 12022.7, subd. (a)). Wilson additionally asserts that there was insufficient evidence that he inflicted the lighter burns on A.Y. for a sadistic purpose, another finding necessary to support his count 1 torture conviction. Wilson's arguments fail under our deferential standard of review.

The scope of our review in this context is well settled. " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is,

71

evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; accord, *People v. Odom* (2016) 244 Cal.App.4th 237, 246 (*Odom*).)

### 1. *Evidence of Great Bodily Injury*

Torture is defined in section 206, which provides: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." Section 12022.7, subdivision (f) defines great bodily injury as "a significant or substantial physical injury." Therefore, torture consists of two elements: (1) a person inflicted significant or substantial physical injury upon another, and (2) that person did so with the specific intent of causing cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or any sadistic purpose. (See *People v. Pre* (2004) 117 Cal.App.4th 413, 419 (*Pre*).)

"Section 206 does not require permanent, disabling, or disfiguring injuries." (*Pre, supra*, 117 Cal.App.4th at p. 420; see *People v. Escobar* (1992) 3 Cal.4th 740, 750 (*Escobar*) [holding that the " 'significant or substantial

72

physical injury' test . . . [c]learly . . . contains no specific requirement that the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function"].)  Rather, " ' "[a]brasions, lacerations and bruising can constitute great bodily injury." ' " (*Pre*, at p. 420; accord *Odom*, *supra*, 244 Cal.App.4th at p. 247; *People v. Washington* (2012) 210 Cal.App.4th 1042, 1047.)  For instance, a split lip, cut under the eye, and broken teeth have been deemed sufficient evidence of great bodily injury. (*People v. Hale* (1999) 75 Cal.App.4th 94, 108 (*Hale*).)  Similarly, a mother's use of a wooden stick to discipline her 6-year-old daughter—causing multiple contusions and swelling on the child's hands, arms, and buttocks which were visible the next day—sufficiently supported a great bodily injury finding. (*People v. Jaramillo* (1979) 98 Cal.App.3d 830, 835–836 (*Jaramillo*).)  Great bodily injury has been summarized as "bodily injury which is significant or substantial, not insignificant, trivial or moderate."  (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 464 (*Quinonez*).)

The "cumulative result of the course of conduct" can constitute great bodily injury, even where no single act, standing alone, results in great bodily injury. (*Odom*, *supra*, 244 Cal.App.4th at p. 247.)  In addition, when determining whether an injury is sufficiently substantial to support a finding of great bodily injury, a victim's age is a relevant consideration.  (See *People v. Flores* (2013) 216 Cal.App.4th 251, 253, 262 [deep dog bite on the leg of a 90-year-old man sufficiently serious even though it healed leaving no scar, in part, due to the age of the victim]; cf. *Jaramillo*, *supra*, 98 Cal.App.3d at pp. 835–836 [multiple contusions and swelling on 6-year-old's hands, arms, and buttocks sufficient].)  Finally, when considering the burn injuries inflicted on A.Y. in this case, we acknowledge that "[t]here is no question there are cases in which the acts of torture were more gruesome.  However, '[w]hen we decide

73

issues of sufficiency of evidence, comparison with other cases is of limited utility since each case necessarily depends on its own facts.' " (*Odom*, *supra*, 244 Cal.App.4th at p. 248.) Thus, our high court "has long held that determining whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury. [Citations.] ' "A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description." ' [Citations.] Where to draw that line is for the jury to decide." (*People v. Cross* (2008) 45 Cal.4th 58, 64; see also *Escobar*, *supra*, 3 Cal.4th at p. 750 [" ' "Whether the harm resulting to the victim. . . constitutes great bodily injury is a question of fact for the jury. [Citation.] If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding." ' "].)

Here, a reasonable jury could reject Wilson's characterization of the lighter burns as "minor" injuries because they were relatively small, required no medical treatment, and left no scars. As Dr. Gilgoff testified, the particular type of branding injury at issue is referred to as a "happy face" or "smiley face" and would require someone "to turn the lighter on and then hold it on such that the metal gets hot enough to brand, then hold in on the skin for it to burn the skin." It would definitely be very painful, and a two year old would be "crying, screaming, moving, trying to get away from the pain." Indeed, the fact that the burns were so perfect in shape suggested to Dr. Gilgoff that A.Y. was unable to move when they were inflicted. Of the four smiley face burns on A.Y., the burn on the minor's foot was older than the other three, which "most likely" were inflicted within a few days of A.Y.'s November 21, 2014 hospitalization. The foot burn could have been anywhere

74

from a week to a month prior to November 21. Although Dr. Gilgoff had no way of knowing how severe the burns were to begin with, one of the burns was still healing when she visited A.Y. in the rehabilitation unit on either December 10, 2014 or January 6, 2015. And the foot burn was still visible during her November 24 physical exam.

Based on these facts, a reasonable jury could infer that Wilson held 2-year-old A.Y. down on four separate occasions (on at least two different dates) while he branded the child's skin with the smiley face, causing A.Y. significant pain and creating injuries substantial enough that they took at least two or three weeks to heal. Given A.Y.'s young age and vulnerability, along with the repetition of the "very painful" injuries over the course of days or weeks, substantial evidence supports the conclusion that this constellation of injuries was more than moderate. (See *Quinonez*, 46 Cal.App.5th at p. 464.) In short, we conclude that substantial evidence exists from which the jury could determine beyond a reasonable doubt that the four branding burns inflicted on A.Y. in this case constituted great bodily injury for purposes of both Wilson's conviction for torture under count 1 and the great bodily injury enhancement with respect to count 5.

### 2. *Evidence of Sadistic Intent*

As stated above, to be guilty of torture, a defendant must inflict great bodily injury on the person of another "with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (§ 206.) In this case, the prosecutor argued that Wilson burned A.Y. for a sadistic purpose. And the jury was properly instructed that "[s]omeone acts with a *sadistic purpose* if he or she intends to inflict pain on someone else in order to experience pleasure himself or herself."

75

Wilson argues the evidence was insufficient on this point because there was no direct evidence supporting the conclusion that he acted for his own sadistic pleasure in burning A.Y. He points out that nobody saw the burning incidents; he did not admit, either directly or indirectly, to burning the minor for a sadistic purpose; and no witness offered any evidence Wilson had ever acted or spoken of acting in such a way. He also argues that there was no evidence A.Y. was afraid of him. Wilson claims that, on these facts, inferring such a mental state would be impermissible speculation. We disagree.

"It is not the amount of pain inflicted which distinguishes a torturer . . . . Rather, it is the state of mind of the torturer—the cold-blooded intent to inflict pain for personal gain or satisfaction—which society condemns." (*People v. Steger* (1976) 16 Cal.3d 539, 546.) Such intent, however, "is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*Pre, supra*, 117 Cal.App.4th at p. 420; accord *People v. Jung* (1999) 71 Cal.App.4th 1036, 1043.) "An inference is a 'conclusion reached by considering other facts and deducing a logical consequence from them.' [Citation.] 'The strength of an inference may vary widely. In some circumstances, the preliminary facts may virtually compel the conclusion. In other circumstances, the preliminary facts may minimally support the conclusion. But to constitute an inference, the conclusion must, to some degree, reasonably and logically follow from the preliminary facts. If, upon proof of the preliminary facts, the conclusion is mere guesswork, then we refer to it by such words as speculation, conjecture, surmise, suspicion, and the like; and it cannot rise to the dignity of an inference.' " (*People v. Boatman* (2013) 221 Cal.App.4th 1253, 1265–1266.)

Under the above rubric, the " '[s]everity of a victim's wounds is not necessarily determinative of intent to torture' since '[s]evere wounds may be

inflicted as a result of an explosion of violence [citations] or an "act of animal fury" ' rather than an intent to inflict pain for revenge, extortion, persuasion, or other sadistic purpose." (*Pre, supra*, 117 Cal.App.4th at p. 420.) " 'It does not follow, however, that because the severity of the victim's wounds is not necessarily determinative of the defendant's intent to torture, *the nature* of the victim's wounds cannot as a matter of law be probative of intent.' " (*Id.* at p. 421, italics added; see also *People v. Mincey* (1992) 2 Cal.4th 408, 433 (*Mincey*) [" 'The condition of the victim's body may establish circumstantial evidence of the requisite intent' " to torture].)  In addition, " '[a]lthough evidence of binding, by itself, is insufficient to establish an intent to torture [citation], it is appropriate to consider whether the victim was bound and gagged, or was isolated from others, thus rendering the victim unable to resist a defendant's acts of violence.' " (*Odom, supra*, 244 Cal.App.4th at p. 247, fn. 8.)  It is also appropriate to consider the duration of the attack, as "a prolonged attack may be circumstantial evidence of an intent to cause cruel or extreme pain.' " (*Hale, supra*, 75 Cal.App.4th at p. 108.)

Here, as stated above, the evidence supports the inference that, on at least four occasions, Wilson restrained two-year-old A.Y. in order to inflict these "perfect" smiley face burns on him.  As Dr. Gilgoff testified, such branding would require someone "to turn the lighter on and then hold it on such that the metal gets hot enough to brand, then hold it on skin for it to burn the skin."  It would definitely be very painful, and a two year old would be "crying, screaming, moving, trying to get away from the pain."  A lighter heated to 120 degrees would take five minutes to burn the skin, while at 155 degrees it takes about one second.  Thus, the acts in question "would require either holding a lighter on for a long period of time and/or holding it on the skin for a long period of time."

Even if Wilson was initially motivated by anger or frustration, the jury could infer from this evidence that Wilson took his time and inflicted these injuries in a controlled and cold-blooded manner that maximized A.Y.'s terror and pain. (Compare *People v. Proctor* (1992) 4 Cal.4th 499, 531–532 [sufficient evidence of intent to torture where victim was "prevented from resisting or escaping" and knife wounds "revealed that a relatively slow, methodical approach had been employed in their infliction, rather than their having resulted from sudden, explosive violence"].)[19] The jury in this case could thus reasonably determine from the totality of the evidence that Wilson had the specific intent to cause A.Y. cruel or extreme pain and suffering for his own sadistic pleasure. Accordingly, we conclude there was sufficient evidence for the jury to find Wilson guilty beyond a reasonable doubt of committing torture in violation of section 206.

## G. *Alleged Instructional Issues*

Wilson also raises two alleged instructional errors related to his torture conviction. He asserts that the trial court's instructions with respect to great bodily injury were erroneous, prejudicially lowering the prosecution's burden of proof. And he argues that the court erred by failing to sua sponte instruct the jury on several lesser included offenses to torture. We reject both claims.

### 1. *Great Bodily Injury Instructions*

With respect to both the torture count and the great bodily injury enhancement for count 5, the trial court instructed the jury as follows:

---

[19] Under such circumstances, we do not find dispositive the lack of specific evidence that A.Y. was acting afraid of Wilson. As Dr. Gilgoff testified, two-year-olds express pain in different ways and might not express it as much when afraid. Moreover, there was evidence from numerous witnesses that A.Y. was whiny and clingy towards mother in the week before his November 21 hospitalization.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than *minor or moderate harm*." (Italics added and omitted.) Relying on *People v. Medellin* (2020) 45 Cal.App.5th 519 (*Medellin*), Wilson argues that these instructions were erroneous because they allowed the jury to find he inflicted great bodily injury on A.Y. as long as the injuries constituted greater than *minor* harm, thus reducing the prosecution's burden of proof.

As stated above, instructional error claims are reviewed de novo. (*Cole, supra*, 33 Cal.4th at p. 1210.) " 'Our charge is to determine whether the trial court " 'fully and fairly instructed on the applicable law.' [Citation.]" [Citation.] We look to the instructions as a whole and the entire record of trial, including the arguments of counsel. [Citation.] Where reasonably possible, we interpret the instructions " 'to support the judgment rather than [to] defeat it.' " ' " (*Quinonez, supra*, 46 Cal.App.4th at p. 465; see also *Rivera, supra*, 7 Cal.5th at p. 326 ["The challenged instruction is considered 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' "].)

In *Medellin*, the prosecutor emphasized the word "or" in the CALCRIM great bodily injury instructions that were also used in this case, repeatedly arguing to the jury that an injury need only be "greater than minor" to constitute great bodily injury. (*Medellin, supra*, 45 Cal.App.5th at pp. 531–532.) Defense counsel countered that the instruction required more than "moderate harm." The trial court, however, failed to clarify the matter, simply repeating the instruction twice as set forth above. (*Id.* at p. 532.)

The Fifth District concluded that the CALCRIM instruction on great bodily harm is ambiguous because " '[u]nder the plain language of the

instruction, the jury could have convicted' Medellin if they believed either greater than minor harm or greater than moderate harm was sufficient." (*Medellin*, *supra*, 45 Cal.App.5th at p. 534.)  The appellate court concluded that both the instructional language and the prosecutor's arguments were error and that the error could not be deemed harmless beyond a reasonable doubt.  (*Id*. at p. 535.)  One justice dissented from this result, stating:  "In my view, there is no reasonable likelihood the jury would parse the instruction in such a tortured way as to create the ambiguity the majority finds."  (*Id*. at p. 539, dissenting opn. of Detjen, J.)

Four months later, the dissenting justice authored a majority opinion rejecting the *Medellin* analysis in *People v. Sandoval* (2020) 50 Cal.App.5th 357 (*Sandoval*).  The court reasoned as follows:  " '[A] jury instruction cannot be judged on the basis of one or two phrases plucked out of context . . . .' [Citations.]  Thus, it is improper to assess the correctness of the instructional definitions of great bodily injury by focusing exclusively on the use of 'or' in the phrase 'minor or moderate harm.'  Rather, that phrase cannot be divorced from the one that immediately precedes it: 'injury that is *greater than*' (italics in original).  '[I]njury that is greater than minor or moderate harm' cannot reasonably be read to mean injury that is more than minor but less than moderate.  Such an interpretation simply does not make sense, legally or grammatically, particularly when the phrase is preceded by the explanation that great bodily injury means physical injury that is 'significant or substantial.' "  (*Id*. at p. 361.)

On this basis, the *Sandoval* court found no instructional error, concluding: "When read as a whole, the definitions of great bodily injury in CALCRIM Nos. 875 and 3160 clearly informed jurors that great bodily injury meant significant or substantial physical injury, i.e., injury that was greater

than moderate harm. There is no reasonable likelihood the instructions led jurors to believe they could find great bodily injury based on injury that was more than minor but less than moderate, or that they could choose which level of harm to use. Moreover, neither counsel argued an injury less than moderate would suffice." (*Id.* at p. 362; see also *Quinonez, supra*, 46 Cal.App.5th at pp. 466–467 [rejecting argument that CALCRIM instructions allowed for a finding of great bodily harm where the injury was only moderate; the instructions were not erroneous or ambiguous and required injuries to be " 'significant or substantial' "].)

We find *Sandoval* persuasive and adopt its analysis here. " 'It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions.' " (*People v. Covarrubias, supra,* 1 Cal.5th at p. 926; see also *People v. Coddington* (2000) 23 Cal.4th 529, 594 [" 'We credit jurors with intelligence and common sense [citation] and do not assume that these virtues will abandon them when presented with a court's instructions' "], overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.) Having considered the challenged instruction in the context of the instructions as a whole and the trial record—which included repeated statements by the prosecutor that great bodily injury was a "significant and substantial injury" and "more than just minor or moderate harm" —we see no reasonable likelihood the jury applied the instruction in an impermissible manner.

### 2.     *Failure to Instruct on Lesser Included Offenses to Torture*

Finally, Wilson claims that, on these facts, the trial court erred in failing sua sponte to instruct the jury on the lesser included offenses of child abuse/endangerment (§ 273a, subds. (a) & (b)), battery (§ 242), battery with serious injury (§ 243, subd. (d)), assault (§ 240), and assault by means likely

to cause great bodily injury (§ 245, subd. (a)(4)) in connection with the torture allegation.  He argues that these errors were prejudicial, requiring a new trial.  Wilson's assertions are, again, unconvincing.

" 'A trial court has a sua sponte duty to "instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser." [Citation.]  Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense.  "The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence." [Citation.]  In light of this purpose, the court need instruct the jury on a lesser included offense only "[w]hen there is substantial evidence that an element of the charged offense is missing, but that the accused is guilty of" the lesser offense.' " (*People v. Landry* (2016) 2 Cal.5th 52, 96.)  "On appeal, we independently review whether the court improperly failed to instruct on a lesser included offense."  (*People v. Macias* (2018) 26 Cal.App.5th 957, 962 (*Macias*).)

"To determine if an offense is lesser and necessarily included in another offense for this purpose, we apply either the elements test or the accusatory pleading test.  'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.  Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404.)

Wilson's assertions to the contrary notwithstanding, his arguments with respect to the child abuse charges are foreclosed by *Mincey, supra*, 2

Cal.4th 408. In *Mincey*, the mother's boyfriend was convicted of the torture murder of her five-year-old son, James, as well as several counts of felony child endangerment. (*Id*. at p. 426.) The defendant argued that, under the accusatory pleading test, he should not have been convicted of both torture murder and one of the felony child endangerment charges, because child endangerment was a lesser included offense of torture murder. (*Id*. at p. 452.) The Supreme Court disagreed. Noting that the information in the case charged the defendant "with the unlawful killing of James with malice aforethought on or about December 23, 1983," our high court concluded that when "the accusatory pleading describes an offense in the statutory language, an offense is a necessarily included offense when the greater offense cannot be committed without necessarily committing the lesser offense. [Citation.] Because the victims of torture murder can be adults, as well as children, it follows that torture murder does not necessarily include child endangerment." (*Id*. at p. 452; see also *In re Hess* (1955) 45 Cal.2d 171, 173–174 [under same reasoning, forcible rape can be committed without contributing to the delinquency of a minor].) In other words, although James was referenced by name in the information, it did not state that he was a child. Thus, the potential lesser included offense of child endangerment was not implicated.

Similarly, in this case, the amended information stated that Wilson "did unlawfully and with the intent to cause cruel and extreme pain and suffering for purposes of revenge, extortion, persuasion and for a sadistic purpose, inflict great bodily injury as defined in [section 12022.7] upon A.Y." The accusatory pleading did not reference A.Y.'s age. Thus, since victims of torture can be adults as well as children, the trial court was not obligated to

instruct the jury on child endangerment as a lesser include offense under either the accusatory pleading or elements test.[20]

Wilson's arguments with respect to the battery/assault offenses fare no better. " ' "It has long been established . . . that 'the least touching' may constitute battery." ' " (*People v. Cruz-Partida* (2022) 79 Cal.App.5th 197, 207, fn. 9, citing *People v. Rocha* (1971) 3 Cal.3d 893, 899, fn. 12.) And " '[a]n assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (*Id.*, at p. 41, citing § 204.) Thus, an assault conviction requires proof the defendant willfully committed an act that by its nature would probably and directly result in a battery. (*Id.* at p. 42, citing *People v. Williams* (2001) 26 Cal.4th 779, 786.) Torture, however, does not require any touching at all.

*People v. Lewis* (2004) 120 Cal.App.4th 882, is instructive. In that case, the People argued "that battery is not a lesser included offense of torture because torture can be committed without touching, force, or violence, which are required elements of battery. For example, torture exists not only where there is direct infliction of injury, but also where injury results from enforced deprivation, such as withholding food and water, causing starvation." (*Id.* at p. 887.) The appellate court agreed, concluding: "The statutory definition of torture does not require a direct use of touching, physical force, or violence, but instead is satisfied if the defendant, directly or indirectly, inflicts great bodily injury on the victim. Thus, a defendant may commit torture without

---

[20] We note, moreover, that the jury was instructed in this case on the lesser included offense of child abuse with respect to count 5, and that specific count was based on the same branding injuries that formed the basis for the torture count. Thus, although not included in the same count, the jury was, in effect, given the opportunity to conclude that the burns constituted child abuse but not torture. It declined to do so.

necessarily committing a battery. Further, nothing in the allegations of the information in support of the torture count establishes that defendant used force or violence against [the victim]. Accordingly, battery is not a lesser included offense of torture under either the elements test or the accusatory pleading test and the court was not required to instruct the jury on battery as a lesser included offense of torture." (*Id.* at p. 888; see also *People v. Jennings* (2010) 50 Cal.4th 616, 684 [rejecting argument that starvation cannot constitute torture and citing the *Lewis* analysis with approval].)

Here, as in *Lewis*, the torture allegations in the amended information do not mention the use of direct force or violence against A.Y. Thus, no lesser included offense instruction for battery was required under either the elements test or the accusatory pleading test. For similar reasons, the trial court did not commit instructional error by failing to instruct on assault and/or assault by means likely to cause great bodily injury as lesser included offenses of torture. (See *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1456 [assault with force likely to produce great bodily injury is not a lesser included offense of torture because "[t]orture requires actual infliction of great bodily injury, but it does not require that the injury be inflicted by *any* means of force, let alone by means of force likely to produce great bodily injury"].)[21]

## III.

## DISPOSITION

The judgment is affirmed.

---

[21] Although we have found error in Wilson's trial with respect to the admission of certain testimonial statements in violation of *Crawford*, we found that error harmless beyond a reasonable doubt. Wilson was entitled to a fair trial, not a perfect one. (*Mincey, supra,* 2 Cal.4th at p. 454.) This record does not establish any cumulative error.

WISS, J.*

WE CONCUR:

HUMES, P. J.

BANKE, J.

A157365N

---

* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.